Opinion
 

 GARDNER, P. J.
 

 In this case we explore the problems of a public defender appointed to represent a defendant who lacks a viable defense, yet declines to plead guilty. We hold that under these circumstances, a public defender has fulfilled his responsibilities when he sees to it that the defendant’s statutory and constitutional rights have been protected and that, when convicted, he is convicted by legally competent evidence. We further hold that under these circumstances, a public defender has no duty to make his client happy by the interposing of useless motions or objections or the presentation of a facade, frivolous or charade defense. Given the posture of this case, we reject a claim of inadequacy of counsel by a public defender who (1) did not voir dire the jury, (2) made no objection to any evidence during the presentation of the prosecution’s case, (3) made no opening statement, (4) cross-examined no prosecution witnesses, (5) presented no evidence on behalf of the defendant, and (6) waived argument to the jury.
 

 Additionally, we reject a charge that the trial judge was guilty of
 
 Marsden [People
 
 v.
 
 Marsden,
 
 2 Cal.3d 118 (84 Cal.Rptr. 156, 465 P.2d 44)] error when he listened to the defendant’s complaints but did not inquire into the thinking process or state of mind of the public defender. In so doing, we part company with some of our brethren on the Courts of Appeal who have held that it is the trial judge’s responsibility, when a
 
 Marsden
 
 situation arises, to make an inquiry into the state of mind or thinking process of a court-appointed attorney.
 

 
 *68
 
 Next, we hold that under some circumstances when a defendant withdraws a plea of not guilty by reason of insanity, it is not necessary that the judge receive a waiver of his right against self-incrimination.
 

 And, last, we hold that before a trial court can find a defendant ineligible for probation on the basis of a conviction of a prior felony that prior felony must be alleged and proved.
 

 Putting all of the above into proper perspective is going to entail a distressingly time-consuming examination of the record and a resulting opinion of unconscionable length. Readers not particularly interested in this field of law would be well advised to flip over to the next case in the advance sheets.
 

 The defendant was charged with forcible rape, attempted forcible 288a and assault by means of force. While we do not have before us a transcript, of the proceedings before the grand jury, we note that the same three witnesses who testified at trial testified before the grand jury, i.e., the 12-year old girl victim of the rape and attempted 288a, her 9-year old brother who was a witness to the rape and attempted 288a and a victim of the assault by means of force, and the arresting officer who came very close to being an eyewitness to the rape. We mention all of this because it becomes part of the mosaic we will develop in attempting to ascertain just what information the public defender had concerning this case and how that information guided his subsequent handling of the case.
 

 After the presentation of the indictment, the public defender was appointed to represent the defendant. The defendant pleaded not guilty and not guilty by reason of insanity. Two doctors were appointed by the court and filed their reports. Each doctor found the defendant to have been legally sane at the time of the commission of the offenses. However, these reports give us some insight into the problems confronting the public defender inasmuch as the defendant told the doctors that at the time of the assaults he was drunk and had no recollection of the incidents although he did not attempt to deny that they had, in fact, occurred. He told the doctors that he had been released from prison about five days before these assaults and had been consuming liquor and barbiturates to the extent that he had no recollection of the assaults. However, since his own brother said he committed the offenses, he seemed to have no particular doubt but that they had occurred.
 

 
 *69
 
 The public defender made a motion for an examination under Penal Code section 1368, which was denied apparently in view of the doctors’ reports which clearly indicated present sanity although that opinion had not been expressly solicited.
 

 In the meantime, the public defender had the defendant examined by a third psychiatrist to determine whether he suffered from some neurological or neuropsychiatric condition which might be responsible for his “continued and uncontrollable delinquent behavior.” He received from this psychiatrist, a Dr. Varga, a complete psychiatric examination, plus an electroencephalogram. (The latter was normal.) This doctor opined that the defendant “might well” be suffering from a condition called “dyscontrol syndrome” in which a small amount of alcohol can trigger violent behavior with no resulting memory of the incident.
 

 Then at trial, the public defender renewed his motion under Penal Code section 1368 and a full hearing on this issue was had. At that hearing, the defendant testified to his excessive drinking and to his consumption of drugs for two days prior to the attacks and further that he had no recollection of the attacks. He said that he had read the transcripts of the testimony of the little girl and the little boy and also the police reports but that they did not refresh his recollection. His testimony was capsulated in one sentence, “I mean to say, that I don’t know whether I committed a crime or not.”
 

 Dr. Varga, the psychiatrist retained by the public defender, testified that he could not say with scientific certainty that at the time of the assaults the defendant was suffering from a mental disorder. He testified, “I may say that the suspicions should be raised on medical grounds but I cannot state this on certainty.” Nevertheless, Dr. Varga felt that the defendant was incapable of understanding the nature and quality of his acts or knowing that they were wrong. This, the doctor opined, was because of his drinking and drug use, and from this the defendant was unable to form a correct judgment as to what he was doing. However, Dr. Varga was of the opinion that the defendant was probably sane in contemplation of Penal Code section 1368. He did not believe the defendant could receive any treatment which would revive his recollection as to the assaults.
 

 The two other appointed psychiatrists testified. They expressed some doubt as to whether the alleged amnesia was genuine but both felt that the defendant was presently sane under the provisions of Penal Code
 
 *70
 
 section 1368. They also repeated their conclusions that the defendant was legally sane at the time of the assaults.
 

 The public defender also called the defendant’s cousin and stepfather to testify as to the amount of liquor he had been drinking the night of the attack. He also called the defendant’s mother who traced the defendant’s history of overconsumption of alcohol and subsequent loss of memory.
 

 At this point, the public defender argued forcefully for a Penal Code section 1368 finding, pointing out that the only defense available was a psychiatric one and that the defendant’s failure to recollect made it quite difficult to defend him.
 
 [1]
 
 The court quite properly denied the Penal Code section 1368 motion. Were the law to the contrary, anyone claiming amnesia could effectively forestall criminal prosecution by alleging amnesia and a resulting inability to cooperate with his attorney.
 

 At this point, the defendant complained to the court of his representation by the public defender contending that he “isn’t quite defending my case like it should be defended and, therefore, I feel that another lawyer should be put on the case with me. Mr. Roth [public defender] doesn’t seem interested in the case. He doesn’t want to make any motions. Just a dump truck. I don’t need him around.”
 

 The court inquired as to just what kind of motions he had in mind and the defendant said, “Well, different kinds of motions.” He said that he was sure the public defender “could find an adequate defense.” He complained that the public defender “keeps claiming and trying to claim guilty. He keeps saying he can’t get a defense going. I thought the man was a lawyer. I need a lawyer, not a dump truck.”
 
 [2]
 

 
 *71
 
 The trial court observed that the public defender was an excellent lawyer and that unless the defendant could point to some motion he should have made that the court didn’t see that changing lawyers was going to do any good. The court denied the defendant’s request and the defendant concluded this exchange by saying, “like a railroad ticket seller to me. He’s all the time trying to get me to plead guilty. I need a lawyer, man.”
 

 The trial then proceeded before a jury.
 

 Officer Rubio testified that he was called to an address in the early morning hours in regard to a family problem. He and Sergeant Rector responded. A young man, Ray, was standing in front of the house. He said that his brother, the defendant, was inside the house beating people up. Officer Rubio entered the house with Ray and Ray pointed to the portion of the house in which his brother was located. The officer entered a bedroom and saw the defendant on the bed. His fly was unzipped and his penis was in a “hardened condition.” The victim, Marcia, age 12, was with him. She was nude from the waist down. A young boy, Ora, age nine, brother of the girl, was also there. The defendant exuded a slight odor of alcohol but seemed to be able to walk and talk normally.
 

 Sergeant Rector also testified that he saw the defendant on the bed with his penis erect and exposed through his pants.
 

 Ora, age nine, testified that his sister came into the room screaming with the defendant behind her. (The defendant’s family and Marcia’s family lived together.) The defendant grabbed Ora’s sister by the neck and held her against the wall. He then grabbed Ora by the hair and held him while he pulled back his other fist in a threatening manner and threatened to hit him. At this point, Marcia said to leave Ora alone. The defendant said he wanted some pussy. Marcia was holding a 7-Up bottle in self-defense. The defendant then threw Ora against a dresser and “stepped [stomped] on me.”
 
 [3]
 
 At that point in the testimony, the boy said his sister was “raped” by the defendant but the district attorney quickly advised him he was not to use that word so he substituted the word “screwed” which may be somewhat conclusionary, but at least it is one step higher on the social scale than another four-letter word usually used in describing this type of activity. Then the defendant tried “to make my sister suck it” by forcing her head down to his penis. In the meantime,
 
 *72
 
 Ray, the defendant’s young brother had kicked out a screen and gone for help.
 

 Marcia, age 12, testified that the defendant came in and ordered her to fix something to eat. Her mother and the defendant’s mother and stepfather were absent from the home. They were apparently still out drinking but because of some altercation between the defendant and his stepfather they had brought the defendant home which turned out to be one of the more disastrous decisions made that particular evening. Marcia, dressed in a nightgown, went to the kitchen to prepare some food. Defendant asked her'if she knew how to “fuck.” She was told to lean up against the sink. When she refused, he threatened to tear her clothes off. She escaped and ran for help to the bedroom occupied by her brothers, Ora and Louis, and two young siblings of the defendant. The defendant followed her into the bedroom, grabbed her and tried to pull her out of the room. Marcia told Ora to call the police. As he ran from the house, defendant told Marcia to get him back or he would kill her. She told Ora to return to the house which he did. When Ora returned, she was able to escape by slipping out of her nightgown. She, Ora and 11-year old Ray, the defendant’s brother, ran to a bedroom and locked the door. Marcia dressed while Ray attempted to kick out a window screen in order to escape. The defendant then threatened to kick the door in if it were not unlocked. The children unlocked the door. The defendant entered and grabbed Ora by the hair, lifted him off the ground, drew back a fist and threatened to hit him if he did not get what he wanted. He told Marcia to pull down her pants or he would hurt Ora. As Marcia began to remove her pants, he threw Ora against the dresser “stepped” [stomped] on him and went to Marcia. She was told to sit on the bed. He removed her underwear, lowered his pants and raped her. He then tried unsuccessfully to compel Marcia to orally copulate him—to get her to “suck my dick.” As indicated, the police officer came in almost in the middle of the rape.
 

 A doctor testified that he examined Marcia shortly after the assault and that her vagina showed signs of forcible penetration.
 

 After the jury was instructed, the defendant again complained to the trial judge of his alleged lack of adequate representation. He said that he did not think that the public defender was adequate, that during the trial he had not made any motions and he had not cross-examined any of the witnesses. He said that from looking at the police report “I can see that there might be an illegal entry on the police and he did not make any motion towards this.” He added, “This whole trial here seems like a
 
 *73
 
 ticket to me, you know, one of them railroad station jobs, and this dump truck is just selling the tickets, man. Plus, also, there’s a few other things, you know, that Mr. Roth—we just personally did not get along, man. I think he doesn’t have any interest whatsoever in this case. He just has not shown me at all that he’s a good lawyer. I believe that I need a further adequate counsel for this case.”
 

 The trial judge explained that Mr. Roth knew what the charges were, that he was familiar with them, and that he was an experienced trial lawyer. When the defendant remonstrated that the public defender had not been able to do anything with “my defense,” the court said, “Let me finish, Mr. Huffman. He is an experienced trial attorney and I recognize the fact that he did not question any of the witnesses in this matter and I assume that it is a trial tactic on his part, that he feels that this is the best possible way in which to handle your matter and that he having entered the plea for you of not guilty by reason of insanity, we will proceed into that matter.” The defendant continued his tirade against the public defender by calling him a “dump truck, that’s what he is.”
 

 The court attempted to reassure the defendant that the public defender enjoyed an excellent reputation with all the judges in the court, was an excellent trial attorney, “and I can only assume that his actions in this matter are based upon his trial tactics. In this matter I feel that he is doing the best he can for you under the circumstances. [¶ Is that correct, Mr. Roth? [¶ Mr. Roth: Yes, your Honor. I don’t really see that there is much else that I can do for Mr. Huffman in this situation. [¶ The Court: And I assume that your actions are based upon your analysis of the case and what you feel is the best under the circumstances? [¶ Mr. Roth: Under the circumstances, yes, your Honor, it is the best I feel I can do. [¶ The Court: All right. In the view of that, the motion for another attorney will be denied.”
 

 The jury found the defendant guilty. The defendant then withdrew his plea of not guilty by reason of insanity. After a spirited debate on the availability of a mentally disordered sex offender proceeding, (MDSO) (see below), the defendant was sentenced to prison.
 

 On appeal, defendant contends:
 

 That his trial counsel was inadequate and that “the war was lost without the defense having fired a single shot even though it had enough ammunition to wage a credible battle.” To which we ask. What ammunition? What battle?
 

 
 *74
 
 However, before beginning to answer each of the defendant’s current contentions in regard to the public defender’s inadequacies, let us look at the case handed to the public defender. The defendant had no defense, on the merits. As the public defender said, his only defense was a psychiatric one, feeble though that might be. No jury in the world was going to acquit him on the guilt phase of the case when his only answer was amnesia, a defense for which juries have a historic distrust. Since the defendant would not or could not plead guilty, we opine that the public defender chose to keep a low profile during that phase so as not to antagonize the jury, to let that part go by the books and salvage what ammunition he had for the sanity phase. After all, under Dr. Varga’s version, there was at least something to argue on the sanity phase. On the guilt phase there simply was not anything to talk about. We should note also that the public defender was quite aware of this when early in the trial he asked unsuccessfully to have two juries, one for the sanity phase and one for the guilt phase.
 

 We proceed now to the defendant’s specific complaints.
 
 [4]
 

 (a) That the public defender asked no questions on voir dire.
 

 In this respect we should note that the trial judge was very thorough and very fair in his own voir dire of the jury which covered over 50 pages of trial transcript. Actually, there is very little left for anyone to ask. Defendant now contends that the public defender should have used voir dire in order to ingratiate himself with the jury. This, of course, is not an acceptable basis for voir dire. As indicated, the public defender had done the best he could to get two juries so that the same jury which heard the sordid facts on the guilt aspect of the case from the mouths of the victims would not necessarily have to listen to the psychiatric aspect of the case which matter, hopefully, would be put on through medical testimony. This was an excellent, if unsuccessful, trial tactic. In view of the posture of the case, we cannot fault the public defender for his decision not to voir dire the jury.
 

 
 *75
 
 (b) That the public defender did not cross-examine any witnesses, did not make an opening statement or closing argument, made no objections and offered no witnesses for the defendant.
 

 Obviously, as indicated, it was the public defender’s strategy to keep a low profile during the guilt phase and not exacerbate the situation so as to make it any worse than it was. He made no opening statement because he had nothing to present. He did not cross-examine the witnesses because there was nothing to cross-examine them about. He offered no witnesses because he had no witnesses at this stage. He made no objections because there was nothing to object to. We have carefully examined the record and the only incident at which a viable objection could have been made, the district attorney corrected immediately. That was when Ora said that the defendant raped his sister.
 

 A trial attorney is under great pressure. At a preliminary examination or in taking a deposition he may explore with impunity, but at trial each question and each objection must have meaning. Each question on direct examination should bring a response that is favorable to and supportive of his side of the case. Each question on cross-examination should be designed to elicit a response that is damaging to his opponent. Each objection should be designed to prevent the presentation of incompetent or irrelevant evidence which is potentially damaging to his position. Merely asking questions to be asking questions or to be making objections to be making objections, is not only improper, it is usually dangerous. As we have said before
 
 (People
 
 v.
 
 Eckstrom,
 
 43 Cal.App.3d 996 [118 Cal.Rptr. 391]), a trial attorney is not there for the purpose of making a pretty record. He is there to give his client the very best professional representation possible, hopefully, with successful results for his client. We cannot fault the public defender for his failure to make objections, to cross-examine, to make opening or to make closing statements. We note with some interest that the public defender was careful to see to it that no witness was excused. In other words, it would appear that he was hanging on to all the witnesses for the purposes of a presentation of what would, hopefully, be at least an arguable insanity plea.
 

 It would further appear that if left to his own devices, the public defender would have chosen to enter only one plea—insanity. However, when his client demurred, then, in view of the repugnancy of the facts to be developed during the guilt phase, the public defender properly chose to let the People put on their proof and inject himself into the case as
 
 *76
 
 little as possible. To say that the People’s case was overwhelming is to be guilty of understatement.
 

 Here, we have not only the testimony of the victim, wé have the eyewitness testimony of her brother and the crushing corroboration by the officers who found the defendant in bed with a nude, 12-year-old child and at the same time boasting a very viable erection. This was no time to rock the boat. This was the time to lay low, sweat it out and then give it the old college try on the sanity phase.
 

 But, says the defendant undaunted, my attorney failed to present some “viable defenses.”
 

 First, he contends that the public defender should have explored the possibility that there was no penetration. In view of the evidence it was rather obvious that this would have been a most indiscreet effort.
 

 Next, he says he should have defended the attempted oral copulation on a diminished capacity theory. In the first place, the public defender was undoubtedly quite aware that juries take a notoriously dim view of the diminished capacity concept although appellate courts seem to love to explore it in the most erudite manner with an end result that countless jurors have been hopelessly confused by recondite and esoteric instructions in this field. In the second place, the evidence available in this sphere, that of Dr. Varga, was going to be used in the sanity phase. Why blow it in the guilt phase?
 

 Next, he says that the statement by the public defender that he had not interviewed the People’s witnesses shows incompetency. If the public defender has to interview all the People’s witnesses in every case,, we are going to have public defender staffs of a size comparable to those of all of the law enforcement agencies. Also, as any experienced criminal trial lawyer knows, attempting to interview minor victims in sex cases is a practice fraught with danger and the possibility of adverse repercussions.
 

 Next, the defendant says that the public defender should have argued that the assault by means of force could well have been simple assault. This is true. “Stomping” on a nine-year-old child may not be assault by means of force. But to what avail would one argue this? The rape and attempted 288a were the serious charges. There was nothing to argue on :hese matters. Why then point up the strength of these by arguing about he rather meaningless assault charge.
 

 
 *77
 
 But, says the defendant, all of the above is meaningless because I withdrew my sanity defense. We, of course, are not privy to just what occurred between attorney and client that led to this decision. All we know was that it was a voluntary decision and apparently came as a change in tactics. The defendant’s present contention that there never was a valid issue on sanity is passing strange. There never was a valid defense on the guilt phase. The sanity phase at least had the glimmering of an argument.
 

 It is for a situation just exactly like this that the law provides that a claimed inadequacy must be factually demonstrated and not based on mere speculation and the burden of establishing trial counsel’s ineffectiveness is on the defendant.
 
 (People
 
 v.
 
 Stanworth,
 
 11 Cal.3d 588 [114 Cal.Rptr. 250, 522 P.2d 1058];
 
 People
 
 v.
 
 Stephenson,
 
 10 Cal.3d 652 [111 Cal.Rptr. 556, 517 P.2d 820].) The record must establish that counsel was ignorant of the facts or the law and that such ignorance resulted in the withdrawal of a crucial defense reducing the trial to a farce or a sham.
 
 (People
 
 v.
 
 Jenkins,
 
 13 Cal.3d 749 [119 Cal.Rptr. 705, 532 P.2d 857].)
 

 We find no inadequacies of counsel.
 

 (2) That the trial court erred in not holding an in-depth hearing on his motion for substitution of trial counsel all of which is in violation of the rules set forth in
 
 People
 
 v.
 
 Marsden, supra, 2
 
 Cal.3d 118.
 

 We have set forth in detail above the facts concerning defendant’s request for substitution of counsel.
 

 All
 
 Marsden
 
 held was that a defendant is denied a fair trial when the trial court refuses to hear enumerated specific examples of inadequate representation. The Supreme Court observed that the trial court’s discretion could not be properly exercised without listening fully to the defendant’s reason for seeking substitution of counsel. Here, the judge listened patiently to each of the defendant’s complaints. There was no pro forma or perfunctory ruling which would indicate a lack of an exercise of discretion. Knowing something of the posture of the case, the trial judge did about all he could in regard to the defendant’s complaints.
 

 Just what “motions” did the defendant wish presented?
 

 First, as to statutory motions:
 

 (1) A Penal Code section 995 would have been a waste of time. The little girl, her brother and the police testified before the grand jury and
 
 *78
 
 while we do not have a transcript of these proceedings, a reasonable inference can be drawn that they testified substantially as they did at trial.
 

 (2) A Penal Code section 1538.5 motion would have been an exercise in futility since the defendant’s own brother invited the officers in, saying that his brother was beating up on people.
 

 (3) Bail. The public defender made a motion for an own recognizance release which was denied.
 

 (4) Speedy trial. No issue.
 

 (5) Demurrer to indictment. Not applicable, the indictment being in the language of the statutes.
 

 (6) Motion for change of venue. There appears to be no basis for such a motion. From aught that appears, this is just one more pitifully squalid case of no great public interest.
 

 (7) In view of the age of the little girl, a motion under Evidence Code section 782 as to her prior sexuality would not appear reasonable.
 

 Next, as to nonstatutory motions:
 

 (1) Since there was no identification problem, there was no basis for a hearing on any alleged impermissibly suggestive pretrial identification procedures.
 

 (2) Since there were no missing witnesses, there was no basis for an
 
 Eleazer [Eleazer
 
 v.
 
 Superior Court,
 
 1 Cal.3d 847 (83 Cal.Rptr. 586, 464 P.2d 42)] motion.
 

 (3) Since there was no informer, there was no basis for a
 
 Theodor [Theodor
 
 v.
 
 Superior Court,
 
 8 Cal.3d 77 (104 Cal.Rptr. 226, 501 P.2d 234)] motion.
 

 (4) Since the defendant was not impeached by any prior, there was no basis for a
 
 Beagle [People
 
 v.
 
 Beagle, 6
 
 Cal.3d 441 (99 Cal.Rptr. 313, 492 P.2d 1)] motion.
 

 
 *79
 
 (5) Since there was no codefendant, there was no basis for an
 
 Aranda [People
 
 v.
 
 Aranda,
 
 63 Cal.2d 518 (47 Cal.Rptr. 353, 407 P.2d 265)] motion.
 

 (6) Since there was no claim that this girl was fantasying, there was no basis for a
 
 Ballard [Ballard
 
 v.
 
 Superior Court,
 
 64 Cal.2d 159 (49 Cal.Rptr. 302, 410 P.2d 838, 18 A.L.R.3d 1416)] motion.
 

 (7) Since there was no missing evidence, there was no basis for a
 
 Hitch [People
 
 v.
 
 Hitch, 12
 
 Cal.3d 641 (117 Cal.Rptr. 9, 527 P.2d 361)] motion.
 

 (8) There did not appear to be any basis for any discriminatory prosecution
 
 (Murgia
 
 v.
 
 Municipal Court,
 
 15 Cal.3d 286 [124 Cal.Rptr. 204, 540 P.2d 44]) motion.
 

 (9) It would appear that the district attorney presented everything he had to the grand jury, so there would be no basis for a
 
 Johnson [Johnson
 
 v.
 
 Superior Court,
 
 15 Cal.3d 248 (124 Cal.Rptr. 32, 539 P.2d 792)] motion.
 

 (10) From the defendant’s statement, it would appear that the public defender was in possession of the district attorney’s file so it would appear that no discovery motion was in order.
 

 While statutory and nonstatutory motions seem to proliferate at an alarming rate (the above simply come to mind and there are undoubtedly many more), we simply cannot find that there exists any viable motion which would lend itself to the facts of this case.
 

 Actually, all we have here is a defendant who is aware that in other cases other defense counsel have made motions and he wanted some for himself. However, we cannot imagine any motion which would have helped this defendant. The public defender entered a not guilty by reason of insanity plea, had doctors appointed, retained his own doctor, made a Penal Code section 1368 motion, moved for separate trials on the two issues and was prepared to try the matter on the sanity phase. All of this was just about all that the traffic would bear in this case.
 

 The trial judge personally had some knowledge of the situation from his examination of the record and from what he heard in court. He advised the defendant that the public defender was an excellent lawyer. He listened to each of the defendant’s complaints. He asked the attorney as to his comments and the attorney simply said in all honesty that there
 
 *80
 
 wasn’t anything else he could do. We hold that there was full compliance with
 
 Marsden.
 

 At this point we part company with
 
 People
 
 v.
 
 Munoz,
 
 41 Cal.App.3d 62 [115 Cal.Rptr. 726], which held that a ruling of the court denying a defendant’s request for substitution of attorneys “without an inquiry into the state of mind of the court-appointed attorney” resulted in a “silent record, making intelligent appellate review impossible.”
 
 (Munoz, supra,
 
 at p. 66.)
 
 Munoz,
 
 in turn, was based on
 
 People
 
 v.
 
 Groce,
 
 18 Cal.App.3d 292 [95 Cal.Rptr. 688], which found error on the part of the trial judge in failing to inquire into counsel’s reasons for his seeming lack of adequate representation. We agree with the dissent of Presiding Justice Draper in
 
 Groce,
 
 which reads in part as follows: “The majority, however, holds that the trial court was under some duty to inquire as to whether counsel’s omission to produce evidence suggested by defendant’s complaint ‘was a matter of discretion or the result of neglect.’ I am at a loss to know how such inquiry can be made. The complementary privileges of the Fifth Amendment and the attorney-client relationship would bar direct inquiry by the court of either defendant or counsel as to the truth of the facts underlying defendant’s complaints. Of course, the prosecutor is present at the hearing. In his presence, the court’s posing of the question suggested by the majority would confront defense counsel with an impossible dilemma. To assert a ‘tactical reason’ would necessarily concede the existence of evidence adverse to defendant but not yet produced by the prosecution. To concede negligence would require defense counsel to affirmatively introduce the evidence, however adverse, before the trial closed, or to create a built-in ground for reversal by adhering to his view, however correct, that the evidence would be harmful. Certainly, if the Supreme Court had intended to raise this problem, the opinion would have discussed it and suggested some guidelines for the trial courts.”
 
 (Groce, supra,
 
 at p. 297.)
 

 When a trial attorney has a game plan and the trial court asks him what it is, the answer is liable to be, and probably should be, “Frankly, your Honor, with all due respect, it is none of your business.” Ours is still an adversary system. In this case, it probably would not have made any difference but it is not difficult to visualize a situation in which, if defense counsel has to show his hand, it would clearly enure to the benefit of the prosecution. With all due respect to the authors of
 
 Munoz
 
 and the majority in
 
 Groce,
 
 they simply exhibit a lack of appreciation of the realities of life on the trial level. The purpose of
 
 Marsden
 
 was to assure the defendant of a fair trial—not to make a pretty record for the appellate court. A trial court’s duties are fully performed when it has
 
 *81
 
 given the defendant every opportunity to present and substantiate his specific charges. (See
 
 People
 
 v.
 
 Earl, 29
 
 Cal.App.3d 894 [105 Cal.Rptr. 831];
 
 People
 
 v.
 
 Jacobs, 21
 
 Cal.App.3d 246 [103 Cal.Rptr. 536];
 
 People
 
 v.
 
 Green,
 
 15 Cal.App.3d 524 [93 Cal.Rptr. 84].) Of course, there is nothing wrong with asking defense counsel if he has any comments at the time charges are being made against him. But making the kind of inquiry of defense counsel suggested by
 
 Munoz
 
 and
 
 Groce
 
 is simply improper.
 

 We find no
 
 Marsden
 
 error in this case.
 

 (3) That the trial court erred in failing to advise the defendant of his constitutional rights when he withdrew his insanity plea.
 

 Before allowing the defendant to withdraw his plea of insanity, the trial court conducted an extended inquiry into the reasons for the withdrawal and his understanding of the rights waived and the consequences of such an act. At this time the defendant again mentioned his unhappiness with his attorney. At this point the court made a thorough inquiry to ascertain that he was withdrawing his plea not on the basis of unhappiness with his attorney but on the basis of an informed and deliberate choice based on the reports and the anticipated testimony of the doctors. The defendant said he was. The inquiry by the court satisfied all the dictates of
 
 In re Tahl,
 
 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449], except that the defendant was not informed of the privilege against self-incrimination. Such inquiry is not called for under these circumstances. When one pleads guilty, one abandons the right to trial by jury, confrontation and also waives his privilege against self-incrimination. The withdrawal of a plea, however, involves the first two rights but has nothing whatsoever to do with self-incrimination. The defendant was not requested to speak at all by reason of the withdrawal of this plea. The advisements given were adequate. Defendant’s reliance on
 
 People
 
 v.
 
 Redmond,
 
 16 Cal.App.3d 931 [94 Cal.Rptr. 543], is misplaced. The procedures set forth in
 
 Redmond
 
 are not necessitated by the withdrawal of an insanity plea alone, but rather of the withdrawal of the plea by a defendant whose present sanity is doubted. The court specifically said in
 
 Redmond
 
 that the rationale of that case was not intended to apply to situations where there was no doubt of a defendant’s sanity in the mind of the trial court and the reports of the examining physicians. “Free withdrawal of the insanity plea under such circumstances should be permitted as it has been in the past.”
 
 (Redmond, supra,
 
 at p. 939.) But, says the defendant, if there wasn’t any doubt as to my sanity, then the public defender should have contested the guilt phase. The answer is that while it may have been arguable, from the standpoint of defense counsel,
 
 *82
 
 there wasn’t any doubt in the judge’s mind when he allowed the plea to be withdrawn.
 

 (4) That the trial court erred in refusing to institute MDSO proceedings.
 

 Welfare and Institutions Code section 6302, subdivision (b) requires that MDSO proceedings be instituted when a defendant is convicted of a sexual offense involving children under the age of 14. However, a defendant who is ineligible for probation is ineligible for MDSO. (Welf. & Inst. Code, § 63Ó1.) A defendant who has suffered a prior felony conviction and is subsequently convicted of rape committed by force or violence is ineligible for probation. (Pen. Code, § 1203, subd. (5).) In this case the prosecution never alleged the prior felony. It came out in the defendant’s testimony at the Penal Code section 1368 proceeding. Based on this, the district attorney opposed any disposition except state prison because of the prior felony. The trial court found the defendant ineligible for probation, denied MDSO and sentenced the defendant to prison.
 

 Defendant relies on
 
 People
 
 v. Warner (Cal.App.) which held that failure to charge and allow prior convictions pursuant to procedures laid down in the Penal Code meant that the priors could not be used as a basis for determining a defendant to be ineligible for probation. Under
 
 Warner,
 
 the priors could be used to determine unsuitability as distinct from ineligibility. Unfortunately for the defendant, the Supreme Court has granted a hearing in
 
 Warner.
 
 However, we feel that if a defendant is going to be found ineligible for probation by reason of a prior felony conviction, it appears only just and fair that the prosecution allege and prove the prior rather than have it come in in some casual manner such as a comment in a probation officer’s report. We note that the courts are exercising a solicitude comparable to that of accepting a guilty plea when extracting an admission of the truth of an alleged prior conviction.
 
 (In re Yurko,
 
 10 Cal.3d 857 [112 Cal.Rptr. 513, 519 P.2d 561].) We note a legislative trend found in Penal Code section 1203.06, subdivision (b) and Penal Code section 1203.07, subdivision (b) requiring ineligibility for probation to be based only on pled and proved priors under certain circumstances. In the absence of a definitive determination by the Supreme Court, we hold that to make a finding that a defendant is “ineligible” rather than “unsuitable” the prior must be pled and proved. Therefore, it is necessary to set aside the commitment to state prison and
 
 *83
 
 remand this case to the trial court for reconsideration of the MDSO proceedings.
 

 Judgment of conviction affirmed; matter remanded to the trial court for hearing on availability of the MDSO program.
 

 Kaufman, J., and Morris, J., concurred.
 

 A petition for a rehearing was denied July 12, 1977, and appellant’s petition for a hearing by the Supreme Court was denied August 18, 1977.
 

 [1]
 

 At this juncture, it should be pointed out that the public defender’s presentation of evidence and his examination of the witnesses showed a high degree of professional skill, a complete understanding of the applicable law and a thorough examination of the facts.
 

 [2]
 

 For the benefit of the uninitiated, “dump truck" is a term commonly used by criminal defendants when complaining about the public defender. The origins of the phrase are somewhat obscure. However, it probably means that in the eyes of the defendant the public defender is simply trying to dump him rather than afford him a vigorous defense. It is an odd phenomenon familiar to all trial judges who handle arraignment calendars thát some criminal defendants have a deep distrust for the public defender. This erupts from time to time in savage abuse to these long-suffering but dedicated lawyers. It is almost a truism that a criminal defendant would rather have the most inept private counsel than the most skilled and capable public defender. Often the arraigning judge appoints the public defender only to watch in silent horror as the defendant’s family, having hocked the family jewels, hire a lawyer for him, sometimes a marginal misfit who is allowed to represent him only because of some ghastly mistake on the part of the Bar Examiners and the ruling of the Supreme Court in
 
 Smith
 
 v.
 
 Superior
 
 Court, 68 Cal.2d 547 [68 Cal.Rptr. 1, 440 P.2d 65],
 

 [3]
 

 Obviously, the court reporter was unsophisticated in the jargon of that portion of our culture who “stomp” their victims.
 

 [4]
 

 In evaluating the public defender’s conduct, we keep in mind the code of trial conduct established by the American College of Trial Lawyers, 1972 revision, which provides in part [DR 2-110, DR 7-102 and DR 7-103]: “(a) Having accepte'd employment in a criminal case, a lawyer’s duty, regardless of his personal opinion as to the guilt of the accused, is to invoke the basic rule that the crime must be proved beyond a reasonable doubt by competent evidence, to raise all valid defenses and, in case of conviction, to present all proper grounds for probation or in mitigation of punishment. A confidential disclosure of guilt alone does not require a withdrawal from the case, but he should never offer testimony which he knows to be false.”