[Crim. No. 34708. Second Dist., Div. Four. Oct. 3, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH SAMUEL TERRILL, Defendant and Appellant.

COUNSEL

Quin Denvir, State Public Defender, under appointment by the Court of Appeal, and Charles M. Sevilla, Chief Assistant State Public Defender, for Defendant and Appellant.

George Deukmejian, Attorney General, Robert E. Philibosian, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General, Edward T. Fogel, Jr., and Janelle B. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**ALARCON, J.**—Defendant has appealed from his conviction for violation of Penal Code section 187, first degree murder, and Penal Code section 211, robbery. It was alleged in the information filed by the Los Angeles County District Attorney that appellant personally used a firearm within the meaning of Penal Code section 12022.5 in the commission of the foregoing crimes. The jury was unable to reach a verdict on the firearm allegations, and a mistrial was declared as to that allegation. Appellant was sentenced to state prison for life. Appellant was given credit for 126 days in custody.

Appellant raises the following contentions on appeal:

1. The trial court made inadequate inquiry concerning the grounds for appellant's motion to substitute counsel.

2. The search of appellant's home was not conducted pursuant to free and voluntary consent.

3. Appellant was denied his constitutional right to a jury determination of whether he acted with the requisite malice sufficient to sustain a verdict of murder.

4. Appellant is entitled to an additional 63 days' credit in determining the length of his sentence.

### Summary of the Facts

Peter Anton Drazin testified that on July 19, 1978, he and his father, Peter John Drazin, were at the Hollywood Park Race Track. In midafternoon, they left the race track and walked to their car. They had parked their car at 104th and Doty Streets in Inglewood. When they were about 20 feet from the car, the witness felt a gun being pressed into his right side. The gun was a very small black revolver. The man holding the gun demanded money, and the witness reached into his pocket and pulled out a $10 bill. He held it in front of him and the man with the gun took it. At this time the witness' father was approximately 10 feet ahead of him on the sidewalk. The witness testified that another man was standing on the witness' immediate left. His father turned around and said, "That's my son. What are you doing to my son?" The son said, "Dad, he's got a gun." At that time his father came toward

them with folded racing forms in his hand. He raised his arm and tried to hit the man on the witness' left side with the papers. The armed man on the witness' right side shot the father. The two men, accompanied by a third man, ran away together in the direction of the race track. Mr. Drazin, Sr., died of a gunshot wound through the heart and aorta. A .22 caliber slug was removed from his body.

Byron Reese testified that on July 19, 1978, he saw Peter Drazin and his father walking toward their car. Mr. Reese was across the street from the Drazins, standing outside of his house talking to a friend. He testified that he saw four young men come up behind the son and his father; he identified each by name, and explained that the one he identified as "Joseph" was the defendant. He had known defendant at that time for about a year and a half. He saw the four young men gather around the father and son; they appeared to be searching them or asking them for money. He saw that Joseph was armed with a gun. He saw the defendant shoot the victim.

Raymond Reese testified that he is the older brother of Byron. On July 19, 1978, as he came out of his house, he noticed three young men running from across the street. He recognized only one of them (not the defendant). One or two days after that incident, he had a conversation with defendant. Defendant called him over and asked him if he knew what had happened the day before. Defendant asked him if Reese was planning to "tell on him" or "put him in it." Reese told him he couldn't put him in it, because he had not seen him there.

Michael Reese testified that he is Raymond and Byron's brother. On the date in question, he saw four persons he recognized, including defendant, walking on the other side of the street. He saw what appeared to be a struggle among the four young men and two white men. He saw that "Joe" (the defendant) and Gary had their hands inside the man's pocket and then "Joe came out with the gun, and shot the man." He saw defendant and the other man run away immediately after the shooting. As they were running away, he again saw the gun in defendant's hand. The next day Mr. Reese saw the defendant who asked him if he, Reese, was going to say anything. Reese said yes, and defendant began to threaten him. Defendant said the Reeses would get their "butts kicked" and their house blown up.

Gary Robinson testified that on July 19, he had met the defendant and some other men, and had agreed to act as a lookout during the

planned robbery of the victims. He saw defendant shoot the victim. He, defendant, and one other man went to defendant's house immediately after the shooting. When they got to defendant's house, defendant hid the gun under a mattress in his bedroom.

Michael Melsh testified that he is a police officer for the City of Inglewood. He arrested defendant on July 27, and conducted a search of his residence. The search revealed one expended .22 caliber cartridge and one live .22 caliber round. The expended .22 caliber cartridge was found under defendant's bed.

Defendant and his two sisters testified that he spent almost all of the day, July 19, 1978, at home listening to music. He denied involvement in the incident in question.

### Appellant's Motion for Substitution of Counsel

On October 22, 1978, eight days before commencement of trial, appellant filed a handwritten motion to have his public defender relieved and new counsel appointed. The motion, in the form of a letter, read as follows: "Dear Honorable Judge. I am writing you in concern of my case and my purpose is Mr. Michael Clark the Deputy Public Defender ho is suppose to defening me in this case. His intention from the beginning was to send me to the pen. He has been up here to see me two times the first time he came he told me that he was going to talk to the District Attorney about the case and see if he can up with a deal for '12' year to told him that I was not going to take nothing for something I did'nt do. So my intention was to fire him when we came to superior court. Thanking that my family would have me a lawyer. Befor I went back to court but they are having a money problem and cannot get me a lawyer. I fill that Mr. Clark is not showing any concern in my case. And fill that he is not doing the best to his ability to help me. The second time he came up here, he told me that he, talked, to the D.A., and said he came up with '15' year and that I should take it, because they are going to fine me guilty anyway. So I on know that his intention is to hang me. So I thought I would write you and let you no that I am going to fire him when I go back to court, on the grounds that I just told you. And would like to request to be defendant by a state attorney I am with 187,211. P.C. and go back to court on the 30th of this month for trial and no that I cannot go with Mr. Clark noin what his intention of doing to me. So I thought I would write you just to let you no why I'm going

to fire him. I have to many problems myself and do not need anymore. My name is Joseph S. Terrill. And I'm suppose to be going to trial on the 30th of this month. Thank you U'Honor I would like to recieve a letter back so I will no that you gotten this one.'

On October 30, 1978, the date set for trial, the court, in the presence of defendant and both counsel, made reference to having received and read the letter from Mr. Terrill. He inquired of Mr. Clark, the deputy public defender assigned to the case, whether he had had a chance to see the letter. Mr. Clark responded that he had not and then stated, "Well, I would think, Your Honor, that the letter would require you to inquire of Mr. Terrill any specifics concerning my representation of him." The court responded:

"THE COURT: Mr. Terrill, I do have your letter here. I did read it when I received it last Thursday. And I do want to say this: That I know from the very beginning after your arraignment a very few days after the arraignment I asked Mr. Clark what the situation was as far as going to trial. And Mr. Clark informed me that this is a case that would have to go to trial and would have to be tried. Now, that would have been some time right after August 24th. I did tell Mr. Clark that I would appreciate it if he would make an effort to contact the district attorney to see if there was a possibility of any disposition. He would be remiss, it would be wrong of him as an attorney when you are faced with such serious charges, as you are, not to explore the possibility of a disposition to see that if there is anything in that type of endeavor could be of benefit to you. It would be terrible where you're charged as you are with the type of crime you are that if your attorney didn't try to do something like that.

"THE DEFENDANT: (The defendant nods his head up and down.)

"THE COURT: Now, your letter indicates that he had, I guess, mentioned to you that what the possibilities of disposition would be, and they are unsatisfactory to you, because you personally believe in your innocence, which is fine. But also you have to know that the People have presented evidence at a preliminary hearing which if accepted by a jury would be powerful evidence and very well could be evidence that if the jury accepted it, would find you guilty.

"THE DEFENDANT: (The defendant nods his head up and down.)

"THE COURT: So, having that in mind, and that background in light of what you've sent me, Mr. Clark is an experienced attorney. He tells me he's ready to proceed to trial today. Is there anything else you'd like to say?

"THE DEFENDANT: No, no, Your Honor.

"THE COURT: All right, sir. Anything further, Mr. Clark?

"MR. CLARK: No, Your Honor. I am ready."

Appellant contends that the court erred in that it failed to make adequate inquiry as to the reasons for appellant's desire to substitute counsel, citing *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]. The *Marsden* court held at page 123 as follows: "A trial judge is unable to intelligently deal with a defendant's request for substitution of attorneys unless he is cognizant of the grounds which prompted the request. The defendant may have knowledge of conduct and events relevant to the diligence and competence of his attorney which are not apparent to the trial judge from observations within the four corners of the courtroom. Indeed, '[w]hen inadequate representation is alleged, the critical factual inquiry ordinarily relates to matters outside the trial record: whether the defendant had a defense which was not presented; whether trial counsel consulted sufficiently with the accused, and adequately investigated the facts and the law; whether the omissions charged to trial counsel resulted from inadequate preparation rather than from unwise choice of trial tactics and strategy.' [Citation.] Thus, a judge who denies a motion for substitution of attorneys solely on the basis of his courtroom observations, despite a defendant's offer to relate specific instances of misconduct, abuses the exercise of his discretion to determine the competency of the attorney. A judicial decision made without giving a party an opportunity to present argument or evidence in support of his contention 'is lacking in all the attributes of a judicial determination.' [Citation.]"

In *People v. Lewis* (1978) 20 Cal.3d 496 [143 Cal.Rptr. 138, 573 P.2d 40], at page 497, the Supreme Court explained that in *Marsden* they "...held that a defendant must be permitted to state the reasons why he believes a court-appointed counsel should be discharged."

Appellant here urges that the allegations made in his letter required that the court conduct a full hearing into the reasons for his dissatisfac-

tion with the public defender. We disagree. The letter did not state vague general dissatisfaction, but specifically alleged that his attorney had been attempting to negotiate a disposition with the prosecutor and had recommended that defendant plead guilty and accept a 15-year imprisonment punishment. Thus, at the beginning of the hearing on the motion, the court was fully apprised of the specific allegations leveled against defense counsel.

Appellant relies on *People* v. *Munoz* (1974) 41 Cal.App.3d 62 [115 Cal.Rptr. 726], for the proposition that the court was obligated to make the specific inquiry of defense counsel with respect to his intentions and state of mind. The *Munoz* court stated at page 66: "In our view, the court's ruling denying appellant's request for a substitution of attorneys, without an inquiry into the state of mind of the court-appointed attorney and without attempting to ascertain in what particulars the attorney was not providing appellant with a competent defense was tantamount to a refusal on the part of the court to adjudicate a fundamental issue; the court's failure to make the inquiry also resulted in a silent record, making intelligent appellate review impossible."

A similar result was reached in *People* v. *Groce* (1971) 18 Cal. App.3d 292 [95 Cal.Rptr. 688]. In that case, defendant lodged several specific complaints against his attorney, including the allegation that his attorney refused to subpoena medical records which defendant contended would establish that the victim had not been cut with a knife. After further discussion with the defendant, the court denied his motion for substitution of counsel. The appellate court reversed the judgment, contending that the trial court should have made "inquiry as to whether the failure to produce those records was a matter of discretion or neglect of appellant's counsel." (*Id.* at p. 296.)

We do not find in *Marsden* or in any subsequent Supreme Court decisions on this subject a requirement that the court make inquiry of *counsel* when a motion for substitution has been lodged. We agree rather with the reasoning of *People* v. *Jacobs* (1972) 27 Cal.App.3d 246 [103 Cal.Rptr. 536], where the court held at page 262: "Accepting defendant's characterization of his motion to dismiss the public defender as having been brought in propria persona, it does not follow that the trial judge was required to question the public defender with respect to the merits of the motion. The trial court's obligation was to give defendant an opportunity to present argument or evidence in support of his

contention that he was receiving inadequate representation. [Citations.]"

In *People* v. *Groce, supra,* 18 Cal.App.3d at page 297, Justice Draper in his dissent addressed the majority's holding that the court should have inquired as to whether counsel's omission to produce evidence was a matter of discretion or the result of neglect. Justice Draper stated: "I am at a loss to know how such inquiry can be made. The complementary privileges of the Fifth Amendment and the attorney-client relationship would bar direct inquiry by the court of either defendant or counsel as to the truth of the facts underlying defendant's complaints. Of course, the prosecutor is present at the hearing. In his presence, the court's posing of the question suggested by the majority would confront defense counsel with an impossible dilemma. To assert a 'tactical reason' would necessarily concede the existence of evidence adverse to defendant but not yet produced by the prosecution. To concede negligence would require defense counsel to affirmatively introduce the evidence, however adverse, before the trial closed, or to create a built-in ground for reversal by adhering to his view, however correct, that the evidence would be harmful. Certainly, if the Supreme Court had intended to raise this problem, the opinion would have discussed it and suggested some guidelines for the trial court."

In the instant case, the allegations in the letter from defendant are that defense counsel was not showing concern for defendant, not doing his best to help him, had recommended that defendant accept a plea bargain, and that defense counsel wanted to "hang" the defendant. If these allegations raise an inference that defense counsel has not prepared for trial, then any obligation on the court to investigate that contention was satisfied in this case. The defense counsel stated twice on the morning of the hearing that he was ready to begin trial.

Appellant contends that the contents of the letter reflect a breakdown in the attorney-client relationship. We disagree. In *People* v. *Williams* (1970) 2 Cal.3d 894, 905 [88 Cal.Rptr. 208, 471 P.2d 1008], the court held that a trial judge may be required to substitute counsel if the disagreement between counsel and client has resulted in a "breakdown in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to effective assistance of counsel." The allegations of defendant do not reflect so drastic a situation between him and defense counsel. Rather, they reflect that defense counsel, aware of the evidence which had been presented against defendant at the preliminary hearing,

was attempting to serve his client's best interests by negotiating a guaranteed maximum state prison term in exchange for a plea of guilty. In the face of such contentions, we cannot imagine what questions would be required by the trial judge. To hold that the trial court must inquire of defense counsel whether there has been a complete breakdown of the attorney-client relationship would be to require a meaningless incantation; the answer would necessarily be no. If such a breakdown had occurred, defense counsel would have joined in defendant's motion for substitution and assuredly would not stand quietly by, announcing ready for trial, in the face of such a motion by defendant.

In *People v. Huffman* (1977) 71 Cal.App.3d 63, 80-81 [139 Cal.Rptr. 264], the Court of Appeal addressed a challenge similar to the case at bar and stated: "When a trial attorney has a game plan and the trial court asks him what it is, the answer is liable to be, and probably should be, 'Frankly, your Honor, with all due respect, it is none of your business.' Ours is still an adversary system...it is not difficult to visualize a situation in which, if defense counsel has to show his hand, it would clearly enure to the benefit of the prosecution. With all due respect to the authors of *Munoz* and the majority in *Groce,* they simply exhibit a lack of appreciation of the realities of life on the trial level. The purpose of *Marsden* was to assure the defendant of a fair trial —not to make a pretty record for the appellate court. A trial court's duties are fully performed when it has given the defendant every opportunity to present and substantiate his specific charges. [Citations.] Of course, there is nothing wrong with asking defense counsel if he has any comments at the time charges are being made against him. But making the kind of inquiry of defense counsel suggested by *Munoz* and *Groce* is simply improper."

In the instant case, the defendant in his letter presented his specific charges. In addition, the court asked defendant: "Is there anything else you'd like to say?" Defendant responded, "No, no, Your Honor." Under these circumstances, we find that the court did conduct an adequate inquiry into the reasons for defendant's motion, and there was no violation of *Marsden.*

▮ In his reply brief, appellant argues that even if the inquiry were adequate, the court abused its discretion in denying the motion in the face of these charges. This contention is not well taken. The *Marsden* court explained at 2 Cal.3d at page 123: "...the decision whether to permit a defendant to discharge his appointed counsel and substitute

another attorney during the trial is within the discretion of the trial court, and a defendant has no absolute right to more than one appointed attorney."

The Supreme Court recently reiterated the rule in *People* v. *Walker* (1976) 18 Cal.3d 232, 238 [133 Cal.Rptr. 520, 555 P.2d 306]: "It is a matter of judicial discretion whether to substitute court-appointed counsel in the absence of a sufficient showing that a defendant's right to counsel would otherwise be substantially impaired."

In the instant case the defendant did not make a sufficient showing that his right to counsel would be substantially impaired if new counsel were not substituted in. The court explained that defense counsel would have been remiss in his duty to defendant had he not attempted to negotiate a disposition of the charges. At the time of the negotiations, defense counsel undoubtedly knew that defendant would be identified by three eyewitnesses as having committed first degree murder. The recommendation that defendant enter a plea with a maximum possible punishment of 15 years in prison under such circumstances cannot be deemed inadequate representation.

"The circumstances in this case substantially differ from those in *Marsden.* Here, the trial court asked for defendant's reasons for substitution and whether he had any other reasons. We cannot find that the trial court's denial of the motion was an abuse of discretion or that defendant's right to the assistance of counsel was substantially impaired by the denial." (*People* v. *Carr* (1972) 8 Cal.3d 287, 299 [104 Cal.Rptr. 705, 502 P.2d 513].)

The denial of defendant's motion for substitution of counsel was not an abuse of discretion.

### The Consent to Search Appellant's Home

Officer Melsh testified that on the morning that defendant was arrested, several officers went to his home on 102d Street in Inglewood, armed with an arrest warrant and a search warrant. Defendant was arrested at approximately 6 a.m., and the search was conducted a few moments later. The search warrant in question was one which permitted a search only between the hours of 7 a.m. and 10 p.m., pursuant to Penal Code section 1533. During the hearing on the motion to suppress

evidence, the court found that the search warrant was executed in violation of that section and was therefore invalid. Evidence was then presented in support of the People's position that the search was conducted, not pursuant to warrant, but by virtue of consent. The following evidence was presented: Officer Melsh testified that when the officers arrived at defendant's home, "We had the house contained front and rear, . . ." The officers telephoned the house, advised them that officers were outside with a search warrant, and requested that the defendant step outside. The officers at the front of the house also announced themselves as police officers with a search warrant. The front door then opened; defendant and his mother stepped out onto the porch. Defendant was immediately arrested and taken into custody. The officer testified: "I then asked permission from Mrs. Terrill to make a search of the residence. And she gave us permission prior to us showing her a search warrant." On further questioning concerning the manner in which consent was obtained, the officer stated: "To the best of my recollection, we asked her for permission to search. And she didn't hesitate. She told us, 'come on in and search.'"

■ Appellant contends that the search was illegal, not a result of voluntary consent, citing *Burrows* v. *Superior Court* (1974) 13 Cal.3d 138, 251 [118 Cal.Rptr. 166, 529 P.2d 590], for the proposition that where consent is "induced by an illegal search or arrest [it] is not voluntary,..." We do not find that the consent here was "induced by" an illegal search. The officers had in their possession a valid search warrant; there was no effort to deceive or coerce Mrs. Terrill into consenting to a search as might have been the case if, for example, the officers stated they had a search warrant where none in fact existed. That fact situation was present in *Bumper* v. *North Carolina* (1968) 391 U.S. 543 [20 L.Ed.2d 797, 88 S.Ct. 1788], and explains why appellant's reliance on that case is not well taken. The officers in this case were armed with a warrant, and the warrant was valid.

An important distinction between the instant case and *Burrows, supra,* is that *Burrows* relates to a finding of innate coercion where a *defendant,* who has just been illegally arrested, consents to a search. In *People* v. *James* (1977) 19 Cal.3d 99 [137 Cal.Rptr. 447, 561 P.2d 1135], the Supreme Court evaluated the voluntariness of a consent to search given by a defendant who was under arrest at the time his consent was given. The court cited the rule in *Burrows* previously quoted and noted that in the *James* case, the defendant's arrest was not illegal. The court then stated at page 109: "In the absence of such illegality, it

is established that the defendant's custody at the time of giving consent to search is a circumstance which is of 'particular significance' but is 'not conclusive' in the determination of voluntariness. [Citation.] 'It cannot be said as a matter of law that consent given by a defendant is involuntary because it is given while he is under arrest.' [Citation.] Rather, the fact is to be weighed in the balance together with all other circumstances bearing on this issue."

It necessarily follows that if consent given by a defendant under arrest is not deemed involuntary per se but is subject to evaluation, then the consent in this case must be analyzed in light of the facts. Although it is likely that defendant's mother knew of the existence of the search warrant before her consent was given, that factor alone would not render the consent involuntary, even though technically the warrant could not have been served for approximately 55 more minutes.

In *People* v. *James, supra,* at page 112, the court observed: "Thus an apparent consent has been deemed involuntary when given in response to . . . an officer's false claim or implication that he was in possession of a search warrant for the premises." The court then explains at footnote 11: "In the latter context it is the element of *deception* which negates the voluntariness of the consent. That deception appears, for example, when the officer falsely claims he either has or can obtain a warrant to search the premises. But the rule is otherwise if the officer actually has probable cause to obtain a warrant and merely advises the defendant of the fact." (Italics added.)

In the instant case, the officers did not inform Mrs. Terrill that if she did not consent to the search, they would conduct an immediate search pursuant to the warrant. It may well be that absent her consent they would have waited until 7 o'clock. In any event, the trial court found that the consent given was voluntary. ■ "The voluntariness of the consent is in every case 'a question of fact to be determined in the light of all the circumstances.' (*People* v. *Michael, supra,* 45 Cal.2d at p. 753 [290 P.2d 852]; accord, *People* v. *Reyes* (1974) 12 Cal.3d 486, 501 . . . .)" (*People* v. *James, supra,* 19 Cal.3d at p. 106.)

In reviewing the issue of voluntariness, the *James* court said: "Our role in reviewing the resolution of this issue is limited. The question of the voluntariness of the consent is to be determined in the first instance by the trier of fact; and in that stage of the process, 'The power to judge credibility of witnesses, resolve conflicts in testimony, weigh evi-

dence and draw factual inferences, is vested in the trial court. On appeal all presumptions favor proper exercise of that power, and the trial court's findings—whether express or implied—must be upheld if supported by substantial evidence.' [Citations.]" (*Id.* at p. 107.)

■ The court did not err in finding that the search was conducted pursuant to consent freely and voluntarily given.

### The Constitutionality of the Felony Murder Rule

■ Appellant contends: "California law has fostered the outmoded fiction of felony-murder since 1872; as such, a reinterpretation of the doctrine is necessary to insure a more direct relationship between the concept of mens rea and homicide." Whether such a reevaluation is called for, it cannot be made by an intermediate appellate court. Appellant's main attack upon the felony-murder doctrine here is that it deprives defendant of his right to a jury trial on the issue of whether he acted with the requisite malice sufficient to sustain a verdict of murder in the first degree.

As recently as 1975, the California Supreme Court reiterated the rule that, "'the felony-murder doctrine ascribes malice. . .to the felon who kills in the perpetration of an inherently dangerous felony.'" (*People* v. *Antick* (1975) 15 Cal.3d 79, 87 [123 Cal.Rptr. 475, 539 P.2d 43].) The rulings of our Supreme Court are binding on all lower state courts. (*Auto Equity Sales* v. *Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937].) Therefore, there was no error in the finding that defendant is guilty of murder in the first degree by virtue of the fact that the murder was perpetrated during the commission of an inherently dangerous felony, armed robbery.

### Good Time and Work Time Credit for Time Spent in Presentence Custody

Appellant was credited with 126 days served, which reflects the time spent in county jail between the date of appellant's arrest and the date of sentencing. On appeal appellant contends that he should have been given additional good time and work time credits for that period. Appellant contends that Penal Code section 4019 mandates that appellant be credited with one-third of his jail term for good behavior and willingness to work.

The issue of entitlement to such presentence credits is presently before the California Supreme Court in *People* v. *Sage* (Crim. 20997)*; *People* v. *Brown* (Crim. 20998); *In re Davis* (Crim. 20999); and *People* v. *Galloway* (Crim. 32982). The record in this matter does not contain sufficient facts to enable this court to determine whether, if such credits were available, defendant is entitled to them. We do not resolve the question of defendant's right to presentence credits in this matter. After the Supreme Court's decision is rendered in the pending cases, defendant will be free to seek any relief to which he is entitled, by way of writ proceedings.

The judgment is affirmed.

Files, P. J., and Kingsley, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied November 29, 1979. Mosk, J., was of the opinion that the petition should be granted.

---

*Reporter's Note: For Supreme Court opinion in *People* v. *Sage* see 26 Cal.3d 498. On June 18, 1980, *People* v. *Brown* and *In re Davis* were retransferred to the Court of Appeal for reconsideration in light of *People* v. *Sage*. Subsequent opinions were not certified for publication.