Filed 3/29/13  P. v. Lewis CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JODY LEWIS,<br><br>    Defendant and Appellant. | D061126<br><br><br><br>(Super. Ct. No. SCD234467) |

APPEAL from a judgment of the Superior Court of San Diego County, Amalia L. Meza, Judge.  Affirmed.

Following a mistrial due to a deadlocked jury, a jury convicted Jody Lewis of assault with a deadly weapon and with force likely to produce great bodily injury (Pen. Code,[1] §§ 245, subd. (a)(1); 1192.7, subd. (c)(8)).  The jury also found Lewis personally: (1) used a deadly weapon (a knife) (§ 1192.7, subd. (c)(23)) and (2) inflicted great bodily injury (§ 12022.7, subd. (a)).

---

[1]    Statutory references are to the Penal Code unless otherwise specified.

The court sentenced Lewis to prison for six years.

Lewis appeals, contending the court erred in denying his multiple *Marsden*[2] motions, failing to adequately explore Lewis's request to represent himself, and failing to provide an instruction that the jury was to view with caution Lewis's out-of-court statements. We affirm.

## FACTS

### *Prosecution*

On May 23, 2011, a group of homeless people were camping under the bridge at Mission Bay. Justice Everett was part of the group. He was drunk, yelling and cursing. Lewis told him to quiet down, but Everett persisted. Lewis then approached Everett and pushed him down. Lewis walked back to his camping spot. Everett continued to yell and call Lewis names. Lewis approached Everett again. A woman named Wendy Lane stepped between the two in an attempt to quell the argument. Lewis pushed her aside and then Everett did the same. Lane retreated back to her area and Lewis ultimately went back to his spot.

Ron Heinze approached Lewis and commented: "What's between you is between you guys. But, Jody, don't put hands on a woman." Lewis then said to Heinze: "I'll kick your ass." In response, Heinze went to his belongings, put his shoes on, and then said to Lewis: "Okay. Come on. You want to kick my ass? You know, do it." Lewis responded: "Well, come on, fat boy. I'll let the air out of you. I'll gut you." Heinze

---

[2] *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

grabbed a handful of rocks and began throwing them at Lewis. Lewis ran toward Heinze, and then veered away and stabbed Everett in the left side of his torso. Lewis then said to Heinze: "Come on, fat boy. Come over here where there's no witnesses."

Everett did not at first realize he had been stabbed until Heinze told Everett that he had been stabbed. Lewis walked to his belongings, picked up a bundle, and walked his bike away from the area. A few minutes later police officers stopped Lewis. An officer called out and asked Lewis for his name. Lewis said his name was Joe. The officer then asked: "Is it Jody?" And Lewis responded, "Yes." The officers found two pocket knives on Lewis and a box cutter knife in a bag attached to the bike.

When an officer examined Lewis, he had a 1/8-inch cut on the webbing between his right ring and pinkie fingers. There appeared to be a blood stain between his left middle finger at the middle knuckle and on his left ring finger. Another small cut was on his left hand, close to the webbing between his ring and pinkie fingers.

Everett required emergency surgery for the stab wound. His spleen was removed because it could not be repaired, and a large amount of blood was removed from his chest cavity. He also suffered a lacerated diaphragm. He had 25 staples in his side, and remained in the hospital for 10 days.

Everett's blood alcohol level when he first arrived at the hospital was .18. Initially, he was belligerent but later became pleasant and cooperative with hospital staff as time passed.

Several days later, one of the people who was present at the stabbing went back to the scene of the crime to clean up the area and found a knife among Lewis's belongings.

3

There was blood on it. He wiped off the handle he had touched, put it in a plastic bag, and labeled it for the case detective. He gave the knife to a police officer in the area. A DNA test on the blade revealed the blood was Everett's.

*Defense*

Lewis testified on his own behalf. He testified that he and Heinze did not like each other, and Lewis had had problems with Everett in the past. Everett was a drunk and a drug addict. The night of the stabbing, Everett was loud, banging on pots and pans. Lewis asked Everett to stop the banging. In response, Everett continued to be loud, and called Lewis several derogatory names. Lewis then approached Everett and asked him to be quiet. Everett took a swing at Lewis. So Lewis threw Everett on the ground and pinned him. After Everett agreed to stop being loud, Lewis let him up. But when Lewis went back to his spot, Everett started up again.

Lewis again approached Everett, who acted like he wanted to fight. Lewis asked Everett to stop the noise. Lane then tried to intervene. At one point, Lane walked into Lewis, which he asserted was an accident, and Lane said: "Don't push me." This time, when Lewis returned to his area, Heinze approached and told Lewis not to put his hands on a woman. Lewis denied doing so and denied he told Heinze he would kick his ass. Heinze responded that he would fight Lewis and put on his shoes. At that point, Lewis decided to sleep somewhere else.

As Lewis gathered his belongings, Heinze began throwing rocks at him. When Lewis saw Everett was about to throw a rock, Lewis ran and pushed him down. Everett fell on a pile of kitchen utensils. Lewis did not stab Everett. Lewis then gathered his

4

sleeping bag and bike and walked away to sleep elsewhere. He had no idea Everett was injured. When the police stopped him, he answered that his name was Jody.

DISCUSSION

Lewis raises three issues on appeal. First, he argues the court abused its discretion in denying his three *Marsden* motions for new counsel. Next, he contends the court erred in failing to explore his comment that he would prefer to represent himself. Finally, Lewis maintains the trial court erred when it failed instruct the jury under CALCRIM No. 358 that it was to view with caution Lewis's out-of-court statements, and he was prejudiced by the lack of this instruction. We reject these contentions.

I

*LEWIS'S REQUEST FOR NEW COUNSEL*

Lewis contends the trial court abused its discretion and violated his rights to a fair trial and the effective assistance of counsel when it denied his *Marsden* motions. We disagree.

A. Lewis's *Marsden* Motions

On September 21, 2011, a week after the first trial mistrial, and more than a month before the second trial began, Lewis made a *Marsden* motion for new counsel. The court asked Lewis to provide specific examples as to why he felt his counsel was not providing effective assistance. Lewis responded that counsel had never established Lewis's "credibility as a witness." Lewis stated the witness testimony was contradictory and that his counsel had not established that Lewis did not commit the crime. When the court pressed Lewis for examples, Lewis responded that the witnesses lied, the court allowed

5

"manufactured evidence," he was not happy with counsel's performance, and the trial was not fair. The court observed that at the first trial counsel had objected to admission of the knife, but Lewis responded that his counsel had not objected strenuously enough. Lewis again stated the witnesses were lying. Lewis's counsel then summarized his 13 years of experience, including 100 jury trials as a criminal defense attorney, and stated he had been appointed to the case approximately one week after appellant's arrest. Lewis's counsel had visited Lewis numerous times and had video conferences with Lewis about the case. Lewis's counsel had interviewed witnesses, visited the crime scene, took photos, and had spent approximately 100 hours on the case. Lewis's counsel stated he thought he had pointed out the witness discrepancies, and he had objected to admission of the knife. He felt he could provide Lewis with effective assistance of counsel. Lewis responded that his counsel had only visited him twice, they had a short time together, and his counsel did not have paperwork with him for the video conference. The court denied the motion.

On October 25, 2011, Lewis made another *Marsden* motion. Lewis stated he was not happy with his counsel's representation and wanted "another attorney. That's all there is to it." The court responded that Lewis did not have the right to counsel of his choice. The court asked Lewis to articulate his counsel's failings. Lewis stated his counsel had not questioned the witnesses properly. Lewis also said that his counsel had not discussed the case sufficiently with him. Lewis complained his counsel had not visited him since the last trial.

6

Lewis's counsel responded by stating he had visited Lewis numerous times and understood his version of the incident. They had gone over his trial testimony, potential cross-examination for evidence presented at trial, and Lewis's counsel had visited Lewis to prepare until the day of trial. Lewis's counsel reiterated his years of criminal experience. He admitted he had not visited Lewis since the mistrial was declared because he already had been through a trial and the defenses and evidence to be presented at trial were well known both to him and Lewis. There was no reason to discuss the possibility of a plea, because Lewis had been adamant about his version of the incident from the very beginning and Lewis had stated in no uncertain terms he would not settle the case. The court again denied the motion.

On November 1, 2011, Lewis made a third *Marsden* motion. The court again told Lewis that he did not have the right to counsel of his choice. Lewis's counsel pointed out that the standard was whether counsel could provide effective assistance and whether there was such a breakdown in communication, counsel could not be effective. Lewis stated there was no communication with counsel about the discovery and they had never worked on the witness statements. The court asked if Lewis's counsel could do it at that time and Lewis responded there was too much discovery to do so in the time available. Lewis stated he had underlined everything in the discovery he wanted to go over with counsel but that it had not done "any good on the first trial. So I don't see why it would make any difference now."

Lewis's counsel responded that he had visited Lewis numerous times before the first trial and he felt he had a "strong sense of the issues, his statements, his

7

testifying . . . ." Lewis's counsel explained: "[T]he issue with . . . [Lewis] and [me] has always been in terms of how he wants to proceed with this case, and there's always been a lack of understanding in that manner." Lewis's counsel added that in light of the first trial, the defense was locked into a certain defense theory. The court asked Lewis's counsel if there was such a breakdown in communication, it was impossible to represent Lewis. Lewis's counsel responded: "Yes." Lewis's counsel explained he and Lewis were "not on speaking terms" and explained that if Lewis felt "uncomfortable," he should have different counsel. The court responded that it had no intention of removing counsel simply because Lewis was not comfortable. Lewis's counsel stated Lewis did not trust him. The court observed that was not the standard. The court pointed out that Lewis's counsel was an experienced attorney and simply because Lewis manifested a "defiant attitude" and wanted the case to proceed in a different direction, that was no reason to replace counsel. Lewis's counsel reiterated he and Lewis were not communicating. The court responded that "just because [Lewis] is not communicating with you, it's not going to result in getting you off the case. I want him to communicate with you." Lewis responded: "Well, I'm not going to, Your Honor. . . . He had his chance. He didn't do anything the first time. . . . Why should he get another chance?" The court stated that it was not going to replace counsel; the showing was insufficient. Lewis retorted: "I'd prefer to defend myself if I have to." The court responded that would be another question, but that counsel was a very good lawyer, he had done his best to represent Lewis, and "you need to work with him."

8

The court stated that it was going to give Lewis and counsel some time to talk. Lewis responded: "I refuse. I'm not working with him. I refuse." The court directed the two to talk. Lewis reiterated it would take hours to go over the discovery. Lewis's counsel again asked the court to relieve him of representing Lewis. The court responded that the standard had not been met because any defendant could assert they refuse to talk to their attorney to force replacement of counsel. Lewis interrupted: "I should be within my rights. That's within my rights." The court continued, explaining a defendant could continue to knock out attorneys until they get the attorney they want. The court gave the two 45 minutes to go over the first trial transcripts. The court stated they could get started and then "we'll see where we go." The court denied the motion. When court resumed, Lewis's counsel stated: "[B]ased on further conversations with [Lewis], I think we're ready to proceed, your Honor."

## B. Law and Analysis

A trial court has broad discretion to grant or deny a motion. When the court denies a *Marsden* motion, we review the denial under an abuse of discretion standard. A denial is not an abuse of discretion unless the defendant shows the failure to replace the appointed attorney would " 'substantially impair' " the defendant's right to competent counsel. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1085.) A trial court's discretionary decision will not be disturbed on appeal if there exists a reasonable or even fairly debatable justification under the law for the action taken. (*Gonzales v. Nork* (1978) 20 Cal.3d 500, 507.) Consequently, we will interfere with the trial court's exercise of discretion only when we conclude that under all the circumstances, viewed most

9

favorably in support of the trial court's action, no judge could have reasonably reached the challenged result. (*Smith v. Smith* (1969) 1 Cal.App.3d 952, 958.)

Under article I, section 15 of the California Constitution, a defendant in a criminal case has a right to competent assistance of counsel. (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.) The right to competent assistance of counsel extends beyond trial and into the plea bargaining process. (*Hill v. Lockhart* (1985) 474 U.S. 52, 58-59.)

Under the *Marsden* standard, a defendant must show that appointed counsel is not providing competent representation or that there is an irreconcilable conflict such that ineffective representation is likely to result. (*People v. Dickey* (2005) 35 Cal.4th 884, 917 (*Dickey*).) However, "a defendant does not have the right to appoint new counsel absent a clear showing of inadequate representation." (*People v. Silva* (1988) 45 Cal.3d 604, 622.) The trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance. (*Marsden, supra,* 2 Cal.3d 118, 124.) A trial court may not deny a request for substitution of attorneys without giving the defendant the opportunity to explain his reasons through presentation of argument and evidence. (*Ibid.*) "All *Marsden* held was that a defendant is denied a fair trial when the trial court refuses to hear enumerated specific examples of inadequate representation." (*People v. Huffman* (1977) 71 Cal.App.3d 63, 77.) When the defendant is afforded an opportunity to state the reasons for discharging an appointed attorney, the trial court's decision to allow a substitution of attorney is discretionary unless the defendant has shown that failure to order substitution is likely to result in constitutionally inadequate representation.

Here, the trial court was within its discretion in concluding that Lewis did not make a showing sufficient to justify the discharge of his appointed counsel. The court held three hearings in response to Lewis's three requests under *Marsden* for new counsel. Ultimately, the record reveals Lewis was simply unhappy with his counsel because of a disagreement over trial strategy and how his counsel conducted the first trial. Disagreements over trial strategy, however, do not " ' "constitute an 'irreconcilable conflict' " ' unless they portend a complete breakdown in the attorney-client relationship." (*People v. Clark* (2011) 52 Cal.4th 856, 912; see *People v. Freeman* (1994) 8 Cal.4th 450, 481 [defendant's distrust of counsel who suggested he plead guilty did not state an adequate basis for substitution of counsel].)

Trial counsel is the person responsible for making all but a few of the tactical trial decisions. (*People v. Carpenter* (1997) 15 Cal.4th 312, 376.) The fact that the defendant does not wish to follow counsel's advice or chooses not to listen to counsel does not require the trial court to replace counsel. (*People v. Smith* (2003) 30 Cal.4th 581, 606; *People v. Clark*, *supra*, 52 Cal.4th at p. 918.)

Because he was unhappy with his counsel, Lewis refused to talk to him. Although the record indicates Lewis did not trust or want his assigned counsel to represent him due to differences of opinion regarding trial strategy, the trial court reasonably concluded that Lewis's refusal to talk to his counsel prevented his counsel from "demonstrat[ing] he was worthy of defendant's trust." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1086; *People v. Crandell* (1988) 46 Cal.3d 833, 860.) The trial court wanted Lewis and his counsel to communicate. Lewis refused to speak to his counsel, which resulted in his counsel

11

opining there was an irreconcilable conflict. However, a defendant cannot compel a substitution of counsel by his own conduct that creates a conflict. (See *People v. Smith* (1993) 6 Cal.4th 684, 696.)

We are satisfied that the trial court made an adequate inquiry into Lewis's complaints concerning his appointed counsel and did not abuse its discretion in denying Lewis's *Marsden* motions. We agree with the trial court that Lewis and his attorney simply had a disagreement over trial strategy and then Lewis tried to manufacture an irreconcilable conflict by refusing to speak to his attorney. The court did not abuse its discretion.

## II

### *LEWIS'S "REQUEST" TO REPRESENT HIMSELF*

Lewis also contends the court erred in failing to explore his conditional request to represent himself. We determine this contention is without merit.

A defendant has a federal constitutional right to represent himself under the Sixth and Fourteenth Amendments. (*Faretta v. California* (1975) 422 U.S. 806, 807 (*Faretta*); *People v. Burton* (1989) 48 Cal.3d 843, 852.) "To invoke the constitutional right to self-representation, a criminal defendant must make an unequivocal assertion of that right in a timely manner." (*People v. Barnett* (1998) 17 Cal.4th 1044, 1087, italics omitted; see also *People v. Bradford* (1997) 15 Cal.4th 1229, 1365.) When an unequivocal motion for self-representation is timely made, the trial court must permit the defendant to represent himself after ascertaining he has voluntarily and intelligently elected to do so, irrespective of how unwise the choice appears to be. (*People v. Windham* (1977) 19

12

Cal.3d 121, 128, citing *Faretta*, *supra*, 422 U.S. at p. 836; *People v. Marshall* (1997) 15 Cal.4th 1, 20-27 (*Marshall*).)

To assess a *Faretta* claim, we review the entire record de novo to determine whether the defendant's invocation of the right to self-representation was knowing and voluntary. (*Marshall*, *supra*, 15 Cal.4th at p. 24.) The standard of review applicable to the court's determination that defendant's request was equivocal is not clear. (*Ibid*.) However, we conclude that under either de novo review or a more deferential standard, the court properly rejected what could only be characterized, at best, as an equivocal motion for self-representation. (*Id*. at p. 23.)

Here, during the hearing on his third *Marsden* motion, Lewis stated: "I'd prefer to defend myself if I have to." Lewis's statement was conditional, and at most, was an equivocal request to represent himself. Lewis's statement raises the possibility that he wanted to represent himself if necessary. Considering the context in which he made the statement, it appears plausible that Lewis might have wanted to represent himself if the court did not appoint new counsel. However, his subsequent conduct belies this argument.

The court denied Lewis's third *Marsden* motion. At that point, Lewis did not say he wanted to represent himself although it was clear the court was not going to appoint new counsel. In addition, the court gave Lewis and his counsel 45 minutes to meet and discuss the upcoming trial. When court resumed, Lewis's counsel stated: "[B]ased on further conversations with [Lewis], I think we're ready to proceed, Your Honor." There is no indication in the record that Lewis disagreed with his counsel's representation or

13

stated that he wanted to represent himself at that point. Under these circumstances, the court had no duty to follow up on Lewis's comment. (See *Marshall*, *supra*, 15 Cal.4th at p. 23 ["Because the court should draw every reasonable inference against waiver of the right to counsel, the defendant's conduct or words reflecting ambivalence about self-representation may support the court's decision to deny the defendant's motion."].) Lewis failed to make an unequivocal request to represent himself although it was clear the court was not going to appoint new counsel. There was no error.

III

*CALCRIM NO. 358*

Lewis next complains that the trial court prejudicially erred in failing to sua sponte instruct the jury under CALCRIM No. 358 on his out-of-court statements because "a lot of focus at the second trial and in closing argument" was on Lewis's statements. The People essentially concede the court erred in failing to instruct on CALCRIM No. 358, but assert the error was harmless on this record. We agree.

The relevant version of CALCRIM No. 358 (Evidence of Defendant's Statements), provides:

> "You have heard evidence that the defendant made [an] oral or
> written statement[s] (before the trial/while the court was not in
> session). You must decide whether or not the defendant made any
> (such/of these) statement[s], in whole or in part. If you decide that
> the defendant made such [a] statement[s], consider the statement[s],
> along with all the other evidence, in reaching your verdict. It is up
> to you to decide how much importance to give to such [a]
> statement[s]. [¶] [Consider with caution any statement made by
> (the/a) defendant tending to show (his/her) guilt unless the statement
> was written or otherwise recorded.]"

14

A trial court has a sua sponte duty to instruct the jury to view evidence of a defendant's oral admissions with caution. (*People v. Carpenter, supra,* 15 Cal.4th at p. 392.) The purpose of a cautionary instruction is to assist the jury in determining if a statement was in fact made. (*Id.* at p. 393.) A cautionary instruction only applies to a defendant's inculpatory statements. (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1200.) "Since the cautionary instruction is intended to help the jury to determine whether the statement attributed to the defendant was in fact made, courts examining the prejudice in failing to give the instruction examine the record to see if there was any conflict in the evidence about the exact words used, their meaning, or whether the admissions were repeated accurately." (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1268.)

Instructional error involves state law and is reviewed under the *People v. Watson* (1956) 46 Cal.2d 818 harmless error standard. (See *Dickey, supra,* 35 Cal.4th at p. 905.) A " 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*Watson, supra,* at p. 836.) The test must be "based upon reasonable probabilities rather than upon mere possibilities." (*Id.* at p. 837.) Further, challenged instructions may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record. (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 365.)

Here, Lewis argues that the court's failure to sua sponte instruct the jury on CALCRIM No. 358 was prejudicial because both of Lewis's out-of-court statements were

15

critical to the prosecution's case. The first statement consisted of Heinze testifying that as Lewis ran down the hill toward him, Lewis said something to the effect of "I'll let the air out of you. I will gut you." Lewis maintains this statement "was the central issue before the jury."

The second statement involved an officer's testimony that Lewis first identified himself as Joe, before he admitted he was Jody. Lewis contends this statement bears on his credibility. He also notes that the prosecutor referred to both these statements during closing argument.

Although we agree with Lewis that the prosecutor mentioned both his out-of-court statements during closing argument and both statements were helpful to the prosecution's case, Lewis ignores the voluminous evidence supporting the guilty verdict. Several percipient witnesses testified, and none of them testified to anything that supported Lewis's version of events. And as noted by the prosecutor during closing, Lewis's version of events was extremely weak as it required the jury to believe that the victim fell onto kitchen utensils, which then plunged into his spleen. Lewis's version also required the jury to disbelieve all of the prosecution's percipient witnesses.

In addition, there was no lack of thorough cross-examination to assist the jury in evaluating the prosecution witnesses. For example, Lewis's counsel thoroughly cross-examined Lane about the fact that Heinze hated Lewis, and that Heinze and another prosecution witness had tried to influence her view of what occurred. But she also testified the efforts did not work and that the two had not been pleased that Lane spoke to the police at all, and that they had wished aloud that Lewis were not in custody so that

16

they could take care of him themselves.  As a whole, the evidence was very strong.

Further, the jury only needed to deliberate for one hour before it returned a guilty verdict,

which reflected the straightforward strength of the prosecution case.

Moreover, other instructions told the jurors how to evaluate the accuracy and

credibility of the witnesses' testimony at trial (CALCRIM No. 226) as well as how to

evaluate the prior statements of a witness (CALCRIM No. 318).  This latter instruction

specifically told the jury:  "You have heard evidence of [a] statement[s] that a witness

made before the trial.  If you decide that the witness made (that/those) statement[s], you

may use (that/those) statements in two ways:  [¶] 1.  To evaluate whether the witness's

testimony in court is believable; AND [¶] 2.  As evidence that the information in

(that/those) earlier statement[s] is true."  (CALCRIM No. 318.)  These instructions,

coupled with the instructions on the elements of assault with a deadly weapon

(CALCRIM No. 875) and the reasonable doubt standard (CALCRIM No. 220),

adequately alerted the jury to carefully review the testimony of the witnesses.  Thus, we

conclude that there is no reasonable probability the jury would have reached a different

result had the trial court instructed the jury on CALCRIM No. 358.

In sum, we believe any error in the court's failure to give CALCRIM No. 358 was

harmless because, on this record, it is not reasonably probable that a more favorable

result would have occurred had the court given such instruction.  (*Dickey*, *supra*,

35 Cal.4th at p. 905.)

17

DISPOSITION

The judgment is affirmed.

HUFFMAN, J.

WE CONCUR:


BENKE, Acting P. J.


McDONALD, J.