Filed 8/15/14  Certified for Publication 9/5/14 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B253401 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA080515) |
| v. | |
| ALEXANDER YOUN, | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court for the County of Los Angeles. Katherine Mader, Judge.  Affirmed.

Richard L. Fitzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Victoria Wilson and Jessica C. Owen, Deputy Attorneys General, for Plaintiff and Respondent.

_____

**SUMMARY**

Defendant Alexander Youn appeals from the denial of his motion to suppress evidence, contending a warrantless draw of his blood violated the Fourth Amendment as construed in *Missouri v. McNeely* (2013) ___ U.S. ___ [133 S.Ct. 1552] (*McNeely*) and *Schmerber v. California* (1966) 384 U.S. 757 (*Schmerber*). We do not reach the question whether the totality of the circumstances in defendant's case justified the warrantless blood draw, because we conclude it was conducted "in objectively reasonable reliance on binding appellate precedent" within the meaning of *Davis v. United States* (2011) ___ U.S. ___ [131 S.Ct. 2419, 2423-2424] (*Davis*), and therefore was not subject to the exclusionary rule. We affirm the order denying the motion to suppress.

**FACTS**

On October 3, 2011, at about 6:30 p.m., defendant was involved in a serious vehicle collision. When Officer Jason Olson arrived at the scene, emergency personnel were loading two patients into ambulances. One of them was defendant. The officer at the scene asked Officer Olson to evaluate defendant for being under the influence. Officer Olson observed that defendant was strapped to a backboard with full head restraint; was combative, "actively trying to move his arms, fight with the paramedics"; had "rapid unintelligible speech"; and was "in and out of [consciousness]." Officer Olson followed defendant to the hospital, where medical personnel were in the process of intubating him.

Defendant was also combative with the hospital staff, so they began to sedate him. Officer Olson, who was trained (and trained other officers) as a drug recognition expert, concluded defendant was under the influence of a drug stimulant (not a narcotic or alcohol). He observed the staff administer three or four doses of very potent sedatives, and defendant was "still combative with them." Officer Olson believed "something had to be going against this highly potent sedative" being administered. Defendant's agitated state, rapid speech, and skin warm to the touch (during Officer Olson's initial contact with defendant at the scene) were factors contributing to his conclusion.

2

Officer Olson placed defendant under arrest and asked a nurse to draw blood from defendant. The blood draw occurred about three hours after the accident, at about 9:30 p.m. Officer Olson found out, "just prior to the blood draw," that defendant was on probation for driving under the influence. Officer Olson did not know if defendant had "a search and seizure condition" on his probation.

After he ordered the blood draw, Officer Olson learned that hospital staff had done an earlier blood draw, and the results were positive for amphetamine and cannabis. Officer Olson saw no objective symptoms consistent with alcohol, but asked the sheriff's laboratory to screen for alcohol as well.

When Officer Olson left the hospital, defendant was still in the emergency room, awaiting a bed in the intensive care unit. Defendant was released from the hospital a month later, on November 3, 2011.

Two years after these events, in October 2013, the trial court held a hearing on defendant's motion to suppress evidence. In addition to testifying to the facts just described, Officer Olson stated that he did not try to get a warrant to draw defendant's blood. He had worked on vehicular manslaughter cases in the past and obtained blood from drivers without a warrant. He confirmed that "it was not standard operating procedure to obtain a warrant for blood draws" in October 2011.

Dr. John Treuting, a consulting toxicologist, testified for the defense. The laboratory report on defendant's blood draw three hours after the accident showed 67 nanograms of methamphetamine and 23 nanograms of amphetamine (the "primary active metabolite of methamphetamine use") in defendant's blood. Dr. Treuting was asked to opine on how long the methamphetamine "was detectable in [defendant's] system from the time of the driving." He testified that "you're looking at 12 to 18 to 20 hours later . . . you would be able to detect it, as far as know that it's methamphetamine."

The trial court took judicial notice that one of the conditions of defendant's sentencing in an earlier case for driving under the influence was that he was not to drive

3

with any measurable amount of alcohol or drugs in his blood and was not to refuse to take any blood alcohol or drug chemical test when requested by any peace officer.

The trial court denied the motion to suppress, stating: "I don't see any evidence that suppressing the blood result in this case would have a deterrent effect on police misconduct because there wasn't any."

The court continued: "I think that the police acted completely reasonably from beginning to end of this investigation. . . . An active investigation of what happened in this accident is ongoing. [¶] They make observations of the defendant that he is not acting normally, that he is being combative, that he's being combative even as they're trying to administer a sedative drug, which raises the suspicion of the police officer as to whether or not he's under the influence of amphetamine. [¶] . . . Officer Olson finds out he's on probation for a DUI. And one of his conditions is that he has no legal right to refuse any type of chemical test. [¶] I understand that that is not specifically what *McNeely*[, *supra*, 133 S.Ct. 1552] addresses. But it is a factor that I think is reasonable for a police officer to take into consideration when they have this person who is tremendously injured, who is being restrained, who is being taken into ICU. [¶] The officers don't know what's going to happen to him next. Is he going to be put in some sort of a coma? Is it going to be artificially or naturally? If he is going to go into a coma, how long is it going to take for him to have access to this person again? Because they obviously don't have access in ICU."

Further, the court said: "They find out that there are amphetamines in this person's system as a result of a screening that has already been done. . . . [¶] But the defendant is sedated. He's got – he's in no position to give consent to any type of blood test. He's already had one blood draw. It's not necessarily that intrusive to do another blood draw, particularly under the circumstances of this type of an accident. [¶] So for all . . . of these reasons – and I already took judicial notice of [the conditions of defendant's probation]. I don't believe that suppressing this evidence would have any deterrent effect on police misconduct, which is the point of us all being here on a motion to suppress the evidence. And so I am denying it."

4

Defendant then pled no contest to driving under the influence causing bodily injury (Veh. Code, § 23153, subd. (a)), a felony, and being under the influence of a controlled substance (Health & Saf. Code, § 11550, subd. (a)), a misdemeanor. The court sentenced defendant to a total term of four years, ordered custody and good time/work time credits and made other orders not at issue in this appeal.

Defendant filed a timely appeal of the trial court's order.

**DISCUSSION**

Warrantless searches " 'are *per se* unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions.' [Citations.]" (*Mincey v. Arizona* (1978) 437 U.S. 385, 390.) One of these exceptions applies "'when the exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment.' [Citation.]" (*McNeely, supra,* 133 S.Ct. at p. 1558.) "To determine whether a law enforcement officer faced an emergency that justified acting without a warrant," courts look to "the totality of circumstances." (*Id.* at p. 1559; *id.* at p. 1559, fn. 3 ["the general exigency exception, which asks whether an emergency existed that justified a warrantless search, naturally calls for a case-specific inquiry"].)

In 2011, when the warrantless blood draw in this case occurred, *Schmerber* was the controlling authority from the high court. In *Schmerber*, the high court applied the totality of the circumstances approach to find that a warrantless blood test in that case was permissible. This was because the officer " 'might reasonably have believed that he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened "the destruction of evidence." ' " (*McNeely, supra,* 133 S.Ct. at pp. 1559-1560, quoting *Schmerber, supra,* 384 U.S. at p. 770.) *Schmerber* observed that evidence could have been lost because "the percentage of alcohol in the blood begins to diminish shortly after drinking stops," and "[p]articularly in a case such as this, where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant." (*Schmerber*, at pp. 770-771.) "Given these special facts," *Schmerber*

5

concluded the warrantless blood draw "was an appropriate incident to [the defendant's] arrest." (*Id.* at p. 771.)

After *Schmerber*, "California cases uniformly interpreted *Schmerber* to mean that no exigency beyond the natural evanescence of intoxicants in the bloodstream, present in every DUI case, was needed to establish an exception to the warrant requirement." (*People v. Harris* (2014) 225 Cal.App.4th Supp. 1, 5, citing cases.) For example:

In 1972, the California Supreme Court said: "It is clear that the Fourth Amendment does not bar a compulsory seizure, without a warrant, of a person's blood for the purposes of a blood alcohol test to determine intoxication, provided that the taking of the sample is done in a medically approved manner, is incident to a lawful arrest, and is based upon the reasonable belief that the person is intoxicated." (*People v. Superior Court* (*Hawkins*) (1972) 6 Cal.3d 757, 761 (*Hawkins*), citing *Schmerber, supra,* 384 U.S. at pp. 766-772; see *Mercer v. Department of Motor Vehicles* (1991) 53 Cal.3d 753, 758 [same]; see, e.g., *People v. Ford* (1992) 4 Cal.App.4th 32, 35 [same]; *People v. Fiscalini* (1991) 228 Cal.App.3d 1639, 1642 [same]; *People v. Ryan* (1981) 116 Cal.App.3d 168, 182 [same; the principle is "well established"].) *Hawkins* further noted: "*Schmerber* recognizes that once the suspect is arrested, a seizure incident thereto may be properly conducted without a warrant, since the rapid dissipation of the alcohol would make the delay involved in obtaining a search warrant unnecessary and unjustifiable." (*Hawkins, supra,* at p. 765, fn. 7.)

In 1982, the court of appeal applied the same rule to drugs, holding that a search warrant was not required for "a nonconsensual withdrawal of a blood sample, in a medically approved manner, as an incident to an arrest" for driving a vehicle under the influence of a drug, where it was settled that the arrest was lawful. (*People v. Ritchie* (1982) 130 Cal.App.3d 455, 457, 458-459.) In *Ritchie*, the court rejected the lower court's conclusion that "there was no evidence that whatever particular drug substance was in the defendant's blood would quickly dissipate and thus the extraction of the blood was illegal." (*Id.* at p. 457.) After citing *Schmerber* and *Hawkins*, the *Ritchie* court said it could detect "no appreciable difference" between "the ingestion of alcohol and the

6

ingestion of drugs." (*Ritchie, supra,* at p. 458.) "While the rate of dissipation may depend on many factors, one, of course, being the type of drug involved, nevertheless, the amount of drug in the blood stream does diminish with the passage of time." (*Ibid.,* fn. omitted.) "We can find no basis for a requirement that law enforcement officials ascertain the nature of the drug ingested in order to determine just how fast it will dissipate. A contrary rule would necessitate that in cases such as this not only would the officer have to identify the drug but some expert testimony would have to be presented as to the rate of dissipation of that particular drug. This appears to be completely unreasonable and places an unnecessary burden on the prosecution." (*Id.* at p. 459.)

This was the state of the law in California until 2013, when the high court in *McNeely* repudiated the longstanding California interpretation of *Schmerber*. *McNeely* held that "in drunk-driving investigations, the natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant." (*McNeely, supra,* 133 S.Ct. at p. 1568.) "In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." (*Id.* at p. 1561.) "[W]hile the natural dissipation of alcohol in the blood may support a finding of exigency in a specific case, as it did in *Schmerber*, it does not do so categorically. Whether a warrantless blood test of a drunk-driving suspect is reasonable must be determined case by case based on the totality of the circumstances." (*Id.* at p. 1563.)

Defendant's case is governed by the rule in *McNeely*: a warrant for the blood draw was required if the police could reasonably obtain one "without significantly undermining the efficacy of the search . . . ." (*McNeely*, *supra,* 133 S.Ct. at p. 1561.) On this point, the trial court observed that the police "have this person who is tremendously injured, who is being restrained, who is being taken into ICU. [¶] The officers don't know what's going to happen to him next. Is he going to be put in some sort of a coma? Is it going to be artificially or naturally? If he is going to go into a coma, how long is it going to take for him to have access to this person again? Because they obviously don't

7

have access in ICU." On the other hand, there was evidence that Officer Olson was a drug recognition expert, that he believed defendant was under the influence of a drug stimulant (not alcohol), and that methamphetamine would continue to be detectable in his blood for at least 12 hours.

We need not resolve the question whether the warrantless blood test was reasonable under these circumstances, because even if it were not, the results of the test would not be excluded from evidence. This is because in 2011, the high court held that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." (*Davis, supra,* 131 S.Ct. at pp. 2423-2424.) This is a species of the "good-faith" exception to the exclusionary rule.

*Davis* explained that the "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations" (131 S.Ct. at p. 2426), and "[f]or exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." (*Id.* at p. 2427.) "[W]hen the police act with an objectively 'reasonable good-faith belief' that their conduct is lawful, [citation], or when their conduct involves only simple, 'isolated' negligence, [citation], the '"deterrence rationale loses much of its force,"' and exclusion cannot 'pay its way.' [Citation.]" (*Id.* at pp. 2427-2428.)

In *Davis*, the police conducted a search of a vehicle passenger compartment, incident to the occupant's recent arrest, that was authorized by the Eleventh Circuit's interpretation of *New York v. Belton* (1981) 453 U.S. 454. But "the search turned out to be unconstitutional" under *Arizona v. Gant* (2009) 556 U.S. 332, which was decided two years after the search occurred. (*Davis, supra,* 131 S.Ct. at pp. 2428, 2425.) The parties in *Davis* agreed that "the officers' conduct was in strict compliance with then-binding Circuit law and was not culpable in any way," and the court held "this acknowledged absence of police culpability dooms [the defendant's] claim." (*Id.* at p. 2428.) The court said: "[I]n 27 years of practice under [the] good-faith exception, we have 'never applied' the exclusionary rule to suppress evidence obtained as a result of nonculpable, innocent police conduct," and " ' "[p]enalizing the officer for the [appellate judges'] error" ' "

could not logically contribute to deterring violations of the Fourth Amendment. (*Id.* at p. 2429.)

The same is true here. Officer Olson acted in "objectively reasonable reliance" on binding California precedent construing *Schmerber*, and there was no police culpability.

To this point, defendant contends only that *McNeely* did not enunciate a new rule, but merely reaffirmed *Schmerber*'s totality of the circumstances test for exigency, and "[j]ust because California courts have uniformly misinterpreted the Supreme Court's decision in *Schmerber* does not mean that police are or were excused from complying with its clear mandates." But that is exactly what *Davis* tell us: the law enforcement officer may not be penalized for the appellate judges' error. Under *Davis*, the exclusionary rule "can have no application in this case." (*Davis, supra,* 131 S.Ct. at p. 2429.)

## DISPOSITION

The order is affirmed.


                                                                    GRIMES, J.


We concur:


            RUBIN, Acting P. J.


            FLIER, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>ALEXANDER YOUN,<br><br>    Defendant and Appellant. | B253401<br><br>(Los Angeles County<br>Super. Ct. No. SA080515)<br><br>**ORDER CERTIFYING**<br>**OPINION FOR PUBLICATION**<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

      The opinion in the above-entitled matter filed on August 15, 2014, was not certified for publication in the Official Reports. For good cause, it now appears that the opinion should be published in the Official Reports and it is so ordered.

      There is no change in the judgment.

_____

RUBIN, Acting P. J.          FLIER, J.          GRIMES, J.