Filed 8/25/15  P. v. Taylor CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D065618 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD248804) |
| KATHERINE TAYLOR, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Eugenia A. Eyherabide, Judge.  Affirmed.

Alex David Kreit, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Peter Quon, Jr., Deputy Attorney General, for Plaintiff and Respondent.

Following a bench trial, Katherine Taylor was convicted of felony driving under the influence (Veh. Code,[1] § 23153, subd. (a); count 1) and felony driving with a blood

---

1    All statutory references are to the Vehicle Code unless otherwise stated.

alcohol level of 0.08 percent causing bodily injury (§ 23153, subd. (b); count 2). Taylor stipulated to her guilt for misdemeanor driving with a license that was revoked for driving under the influence of alcohol (§ 14601.2, subd. (a); count 3). As to counts 1 and 2, it was alleged that Taylor was previously convicted of violating section 23152, subdivision (a) within the meaning of sections 23626 and 23540 for refusing to submit to a chemical test requested by a peace officer within the meaning of section 23577 and that Taylor, in the commission of the above offenses, caused injury to more than one victim within the meaning of section 23558. Taylor appeals, contending (1) a warrantless blood draw conducted after she refused to submit to a voluntary blood test violated her Fourth Amendment right against warrantless searches and seizures and (2) she was denied effective assistance of counsel by the trial court's failure to conduct a hearing pursuant to *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*). We affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

The facts underlying this case are not materially disputed. Several stipulations were entered into before trial including the fact Taylor drove a vehicle involved in a collision with at least one other vehicle and the collision caused bodily injury to three other people. Taylor's car swerved from the number three lane on northbound Interstate 805 into the number two lane, hitting someone else and causing another car to lose control. Witness Scott Staples described Taylor's driving as erratic and observed her in

---

[2]    The facts pertaining to Taylor's arrest and blood draw are taken from the transcript of the Penal Code section 1538.5 suppression motion.

the driver's seat of her vehicle. The accounts of Taylor swerving between lanes and causing the accident were substantiated by other witnesses.

California Highway Patrol (CHP) Officer Kevin Rinehart arrived on the scene of the multi-car collision at approximately 3:56 p.m. He noted several vehicles were on the northbound center divider of Interstate 805 and took statements from the witnesses. Damage to all the vehicles involved in the collision was consistent with the witnesses' accounts of Taylor's driving.

Officer Rinehart spoke to Taylor who appeared intoxicated because she stumbled around, was incoherent in answering questions, had bloodshot eyes, and stated "Satan" had caused her to crash. At no time during the investigation did Taylor suggest or state that another car had caused her to swerve between lanes. Officer Rinehart administered several field sobriety tests on which Taylor performed poorly.

Taylor was arrested at 4:25 p.m. and transported to a local CHP Office where she refused to undergo a chemical blood alcohol test. When Taylor refused, officers explained to her when a person drives a vehicle in California he or she has impliedly consented to chemical testing of his or her blood or breath to determine blood alcohol content (§ 23612, subd. (a)(1)(A)). Additionally Officer Rinehart explained to Taylor if she did not consent to the chemical test her license would be suspended for a year. Taylor still refused.

CHP Officer Brad Clinkscales testified that because Taylor had refused to submit to a blood test, the fact she was arrested for a felony, and the alcohol in her blood was dissipating, he decided to seek a telephonic search warrant. He specifically took steps to

3

obtain a warrant due to then recent United States Supreme Court authority, *Missouri v. McNeely* (2013) 569 U.S. ___ [133 S.Ct. 1552] (*McNeely*).  Officer Clinkscales contacted the on-call deputy district attorney who attempted to call the on-call magistrate judge, but the judge was not available and did not answer the phone.  Officer Clinkscales knew the courts were closed and not due to open until 8:00 o'clock the next morning.  He was also aware that on average, alcohol dissipates from the body at a rate of 0.02 percent per hour and a delay could have resulted in the evidence being completely gone or almost nonexistent.  According to Officer Clinkscales, his department's standard procedure did not include multiple attempts to contact a judge.  Rather, the deputy district attorney advised him that *McNeely* allowed him to take Taylor's blood when the judge was unavailable to issue a warrant.  Following this discussion, Officer Clinkscales went ahead and arranged for a warrantless blood draw of Taylor at 6:43 p.m.  The parties stipulated that Taylor's blood alcohol content was 0.18 percent.

Taylor moved to suppress evidence of her blood draw on grounds police violated her constitutional rights against unreasonable searches and seizures by detaining her without reasonable suspicion, drawing her blood without a warrant or exigent circumstances, and obtaining statements during the allegedly unlawful arrest.  In September 2013, after the motion was continued a few times, Taylor became frustrated and wrote a letter to the judge stating she was "getting ready to ask for a Mardisen [*sic*] hearing" and "I think this is grounds for dismissal!"  In the letter, Taylor asked for leniency because "this was not a car-jacking or stolen vehicle."  She expressed frustration about not being offered DUI classes and asked for alternative sentencing, listing the

4

options she would prefer: "#1 I'll take re-entry program. [¶] #2 I'll take jiont [*sic*] suspension, lid. Stay prison term. C-PAC [¶] #3 Or time served. DUI classes"

Taylor's suppression motion was heard in October 2013. Following the testimony of Officers Reinhart and Clinkscales, Taylor argued the single telephone call to the judge was an insufficient effort to obtain a search warrant so as to justify the forced warrantless blood draw. The trial court confirmed that *McNeely*, *supra*, 133 S.Ct. 1552 governed, but expressed its view that the decision did not provide clear guidance on the issue. Though the court stated that Taylor's arguments were reasonable, it found *McNeely* did not require anything more than what Officer Clinkscales did, which was to contact the deputy district attorney who then unsuccessfully attempted to contact a magistrate judge in an effort to obtain a warrant. After summarizing the circumstances of Taylor's blood draw, the court denied the motion to suppress, ruling the warrantless blood draw was constitutionally permitted under *McNeely*.[3]

---

[3] In part, the court stated: "In this particular case, Officer Rinehart came upon kind of a chaotic scene, out on [Interstate] 805, with all these three or four cars that were involved in an accident, all of these people out of their cars. It took him a while to kind of get the lay of the land and see what was going on. [¶] I mean, he said that the call came in at 3:46; so that's the time of the crash, the time of the driving. And then by the time—he got there at 3:56, arrested [Taylor] at 4:25, took her back to the station, talked to Officer Clinkscales. [¶] Officer Clinkscales spoke to the D.A. and finally got the word back, and then they did the blood draw at 6:43. It is now a full three hours from 3:46, the time of the accident, to 6:46, a full three hours. So I think the officers were well within the guidelines to do this forced blood draw under the circumstances. [¶] Three hours had gone by, and the alcohol in the blood was obviously dissipating. It would have been different, as I said, if she was arrested, taken back to the station. I think the delay in the accident scene caused a lot of the delay; so there was quite a bit of delay here through no fault of the officers, and I really can't find any fault with what they did and that they were required to keep trying to find a judge. [¶] So I think that blood draw was

In December 2013, the court held a hearing to determine if Taylor was mentally competent to stand trial. During the hearing, Taylor made multiple unsolicited outbursts in the courtroom. After the court found Taylor competent to stand trial, it proceeded to set January dates for a pretrial readiness hearing and trial. Taylor continued to interject commentary in the following colloquy:

"[Taylor:] No. I'm, I'm sorry. That's too much. I need more time. It's too far away. I am going crazy in San Diego jail, okay? [Defense counsel is] telling me I got to sign for three years before I go to this behavioral health court. [¶] The whole thing is backwards and it's not right, Your Honor. I've been sitting in county jail for eight months on this, something that I didn't—I was drinking. I will never drink again, but I didn't cause this accident. [¶] And for me to lose my social security and be put in (unintelligible) is not humanly fair. It's not what you guys are doing to me. It's (unintelligible.) It's turning me into somebody that I'm not. I don't want (unintelligible).

"The Court: "All right. Miss Taylor, that's why you have an attorney to represent you.

"[Taylor]: I can't stay in jail. I can stay in county jail (unintelligible) any more time. I can't do it—[¶] . . . [¶] It's too far away. I'm losing my mind, I'm losing my mind. [¶] . . . [¶] I didn't kill anyone. No one got hurt in this accident. Why are you doing this to me, why? I want to know. I stopped smoking crack cocaine. I am trying— I got back into society by working hard and doing something productive, and this is what

constitutionally permitted under the *McNeely* case; . . . the [section] 1538.5 motion is going to be denied . . . ."

6

you're doing? [¶] It's going to put me back in jail. That's going to create me back into a person that I don't want to go back to, and it's not right. What you guys are doing to me, it's not fair. [¶] I spoke to Jerry Brown. I want a person that needs to pay attention. I should be in D.U.I. classes right now, be with my grandchildren for the holidays. What you guys are doing is wrong. [¶] She wants me to sign for a three-year deal before you even put me in (unintelligible) don't accept me. I'm just railroaded into doing something that is not even fair, and it's supposed to be punishment, not brutal. I've served enough time for this. I still don't feel that—

"The Court: [Defense counsel], would it be of any benefit to your client if we moved up the readiness?

"[Defense counsel]: If they have something available next week because, after that, I'm going to be on vacation until the end of the year, so I don't know.

"[Taylor]: Why are you doing this? I'm sorry. Why? I did enough time for this. I realize what I did wrong. Any more time is not going to—

"The Clerk: We can try to do December 9.

"The Court: [Defense counsel], how about we put the readiness on December 9th? I don't know what will be accomplished. Are you available then?

"[Defense counsel]: I am, your honor. My, my concern is this case has been on for readiness and trial quite a few times, and I've actually—

"[Taylor]: I would like to fire her.

"[Defense counsel]:—I've spoken with the D.A. several times outside the readiness department, through e-mail, over the phone, to try to renegotiate and

7

renegotiate this case. [¶] The problem is they have come up with some, some options for Miss Taylor. Part of that includes a stayed prison time with local custody followed by residential treatment. She's not interested in that. And the other option is a state prison sentence. Because of this charge, it is a state prison case; it is not local prison.

"[Taylor]: I'm AB 109, doing excellent on probation.

"[Defense counsel]: So the problem I have—

"[Taylor]: You're fired. I'm not working well with you. [¶] December 9th would be fine, Sir.

"The Court: Okay. Ma'am, I need to speak to your attorney.

"[Defense counsel]: My concern is that I don't know if another readiness is going to change anything. If Miss Taylor wants to do a *Marsden* hearing on that morning, we can do that; that's fine—

"The Court: Well—

"[Defense counsel]:—I just, I, I'm concerned because there have been several readinesses in this case where I've negotiated and renegotiated, and Miss Taylor is not happy with the deals that I've negotiated. And I've explained the behavioral health court situation to her because you have to enter a plea with a certain amount of time on the plea form, if you're not accepted, then you get that sentence. And so she's not happy with that, either—

"[Taylor]: Because the sentence is way too high."

The trial court eventually reiterated the upcoming January hearing dates, but remarked: "Well, [defense counsel], your client's obviously upset. She wants to move

8

her case along." When counsel expressed her view that she did not think her client's offer would change with an earlier date. Taylor interjected: "December 9th, [defense counsel], and e-mail me and do your job; you're not doing your job."

After moving up the court date, the court advised Taylor that her attorney was "one of the best attorneys in the courthouse" with good rapport with the district attorney's office, that counsel was respected and Taylor "couldn't do better." Taylor responded in part that she appreciated the comment, but "this term that you're giving me is an outrageous term." The court responded, "Well, okay. You're entitled to your opinion, ma'am. You're the one that's charged with a crime here; and it's totally up to you as to what's going to, what you're going to do. . . . [¶] So as I said, you do what you want. We've moved up your date [to] the 9th of December. [Defense counsel] will go in, talk to the D.A. again for you, and try to get the best deal that she can for you." Taylor replied, "Yes, Sir." The court and Taylor engaged in further conversation about Taylor's background. The hearing concluded without Taylor renewing her request to fire her counsel.

Following a bench trial, the court denied Taylor probation and sentenced her to a four-year prison term.

## DISCUSSION

### I. *Motion to Suppress Blood Draw Evidence*

A. *Legal Principles*

1. *Fourth Amendment*

9

The Fourth Amendment provides in part that "[t]he right of the people to be secure in their persons, houses, papers and effect, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause."  (U.S. Const., 14th Amend.; see *McNeely*, *supra*, 133 S.Ct. at p. 1558.)  The touchstone of the Fourth Amendment is reasonableness.  (*Riley v. California* (2014) ___ U.S. ___ [134 S.Ct. 2473, 2482].)  Searches without a warrant are presumptively unreasonable.  (See *People v. Troyer* (2011) 51 Cal.4th 599, 602; *People v. Harris* (2015) 234 Cal.App.4th 671, 682-683.)  " 'Nevertheless, because the ultimate touchstone of the Fourth Amendment is "reasonableness," the warrant requirement is subject to certain exceptions.' "  (*Troyer*, at p. 602; *McNeely*, 133 S.Ct. at p. 1558.)  The principle that a warrantless search is reasonable only if it falls within a recognized exception applies to compelled blood draws for use as evidence in a criminal investigation, as "[s]uch an invasion of bodily integrity implicates an individual's 'most personal and deep-rooted expectations of privacy.' "  (*McNeely*, *supra*, 133 S.Ct. at p. 1558.)

One well-recognized exception to the warrant requirement is when the " 'exigencies of the situation make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment.' "  (*McNeely*, *supra*, 133 S.Ct. at p. 1558.)  Exigency may arise, for example, when law enforcement officers have the need to prevent the imminent destruction of evidence.  (*Ibid.*; see *People v. Thompson* (2006) 38 Cal.4th 811, 820.)

In April 2013, the United States Supreme Court decided *McNeely*, *supra*, 133 S.Ct. 1552.  There, the defendant was pulled over for speeding and repeatedly crossing

10

the centerline. (*Id*. at p. 1557.) He was placed under arrest after refusing to take a breath test. (*Ibid*.) The officer began to take McNeely to a station, but after McNeely stated he would not provide a breath sample, police transported him to a hospital, where McNeely refused to provide a blood sample and his blood was drawn without a warrant. (*Ibid*.)

The *McNeely* court held that the natural dissipation of alcohol in the bloodstream did not categorically establish exigency that would justify an exception to the warrant requirement for nonconsensual blood testing in drunk-driving investigations. (*McNeely*, *supra*, 133 S.Ct. at p. 1556.) Instead, "exigency in this context must be determined case by case based on the totality of the circumstances" and thus "the metabolization of alcohol in the bloodstream and the ensuing loss of evidence are among the factors that must be considered in deciding whether a warrant is required." (*Id*. at pp. 1556, 1558.) Pointing out that delay is inevitable in the transportation of drunk-driving suspects to a medical facility, the court stated that "in those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so." (*Id*. at p. 1561.) In cases where "the warrant process will not significantly increase the delay before the blood test is conducted because an officer can take steps to secure a warrant while the suspect is being transported to a medical facility by another officer . . . , there would be no plausible justification for an exception to the warrant requirement." (*Ibid*.) The court acknowledged that "improvements in communications technology do not guarantee that a magistrate judge will be available when an officer needs a warrant after making a late-night arrest. But technological

11

developments that enable police officers to secure warrants more quickly, and do so without undermining the neutral magistrate judge's essential role as a check on police discretion, are relevant to an assessment of exigency." (*Id*. at p. 1562.)

Nevertheless, *McNeely* made clear that "exigent circumstances justifying a warrantless blood sample may arise in the regular course of law enforcement due to delays from the warrant application process." (*McNeely*, *supra*, 133 S.Ct. at p. 1553.) "Other factors present in an ordinary traffic stop, such as the procedures in place for obtaining a warrant or the availability of a magistrate judge, may affect whether the police can obtain a warrant in an expeditious way and therefore may establish an exigency that permits a warrantless search. The relevant factors in determining whether a warrantless search is reasonable, including the practical problems of obtaining a warrant within a timeframe that still preserves the opportunity to obtain reliable evidence, will no doubt vary depending upon the circumstances in the case." (*Id*. at p. 1568.)

2. *The Good Faith Exception to the Exclusionary Rule*

The exclusionary rule " 'operates as a judicially[-]created remedy designed to safeguard against future violations of Fourth Amendment rights through the rule's general deterrent effect. [Citations.]' [Citation.] Thus, its ' "prime purpose" ' is to ' "effectuate" ' the Fourth Amendment's guarantee against unreasonable searches or seizures by 'deter[ring] future unlawful police conduct.' [Citation.] . . . [B]ecause the exclusionary rule is a 'remedial device,' its application is 'restricted to those situations in which its remedial purpose is effectively advanced.' " (*People v. Willis* (2002) 28 Cal.4th 22, 30.) Thus, the remedy of the exclusionary rule is not warranted where it would " ' "not result

12

in appreciable deterrence." ' " (*Ibid*.) These circumstances give rise to what is commonly known as the "good faith exception" to the exclusionary rule. (*Ibid*.; see *Davis v. U.S.* (2011) ___ U.S. ___ [131 S.Ct. 2419, 2434].)

"When considering whether to apply the good faith exception, we consider the objective reasonableness of both the officer who conducted the search and those who provided information material to the searching officer. [Citations.] We consider whether, in light of the source of the erroneous information, the deterrent effect of exclusion is sufficient to warrant imposition of that sanction. [Citations.] The determination of whether the application of the exclusionary rule is warranted is made on a case-by-case basis." (*People v. Hamilton* (2002) 102 Cal.App.4th 1311, 1315.) Typically, when police action manifests a "deliberate," "reckless," or "grossly negligent" disregard for the Fourth Amendment, the deterrent value of exclusion will be strong and will tend to outweigh the resulting cost of exclusion. (*Herring v. United States* (2009) 555 U.S. 135, 144.) Conversely, when police act with objectively reasonable good-faith belief that their conduct is lawful or when conduct involves only isolated negligence, exclusion of evidence will prove of little deterrent effect. (*United States v. Leon* (1984) 468 U.S. 897, 908, fn. 6, 919.)

B. *Standard of Appellate Review*

The review of issues related to suppression of evidence is governed by federal constitutional standards. (*Robey v. Superior Court* (2013) 56 Cal.4th 1218, 1223; see *People v. Bradford* (1997) 15 Cal.4th 1229, 1291; Cal. Const., art. I, § 28.) Because a warrantless search is presumed to be unreasonable, when a defendant moves to suppress

13

evidence on grounds of an unreasonable search, the prosecution bears the burden of demonstrating a legal justification for the search. (*People v. Suff* (2014) 58 Cal.4th 1013, 1053.) The prosecution therefore has the burden to prove an exigency existed. (See *People v. Duncan* (1986) 42 Cal.3d 91, 97.) " ' "The standard of appellate review of a trial court's ruling on a motion to suppress is well established. We defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment." ' " (*People v. Suff*, at p. 1053.)

When the issue is whether exigent circumstances justified a warrantless search, we engage in a similar two-step inquiry. First, we uphold the trial court's finding of fact as to what the officer knew or believed and what action he took in response if those findings are supported by substantial evidence. Second, we independently determine whether the officer's conduct was reasonable under the circumstances. (*People v. Duncan*, *supra*, 42 Cal.3d at p. 97.)

C. *Contentions*

Relying on *McNeely*, *supra*, 133 S.Ct. 1552, Taylor contends the People did not meet their burden to show the police could not have " 'reasonably obtain[ed] a warrant . . . without significantly undermining the efficacy of the search . . . .' " She points out there was no evidence to explain why the deputy district attorney did not continue his efforts to seek a warrant during the 30 minutes between his initial effort and her blood test. She argues no evidence showed it would have been impractical or futile

14

for the district attorney to try to call the on-call judge again, and the record does not show he left the judge a message. According to Taylor, the judge's failure to pick up the phone was a "momentary delay" that did not create an exigency, and the district attorney's failure to take additional steps to obtain a warrant is, on its own, grounds for reversal. Taylor further argues Officer Rinehart's and Officer Clinkscales's inexplicable delay in beginning to seek a warrant after her arrest negates any possible inference of exigency.

The People respond that evidence from the forced blood sample should not be suppressed because the officers directed the blood draw in good faith reliance on *McNeely*. They point out *McNeely* recognized that anticipated delays may arise in obtaining a warrant, such as here where a magistrate judge was unavailable, which could justify a warrantless blood draw.

D. *Analysis*

The trial court found, contrary to Taylor's argument, that the officers did not unreasonably prolong their investigation or create their own exigency by delaying the request for a search warrant. We conclude that finding is supported by substantial evidence. As summarized above, Officer Rinehart arrived on the scene of a multi-car accident. He assessed damage to each of the vehicles, interviewed the witnesses on the scene, and also spoke to Taylor and administered field sobriety tests. Taylor presented no evidence to indicate Officer Rinehart in any way prolonged his investigation unnecessarily or purposefully delayed requesting a warrant. Officer Clinkscales testified at the suppression hearing that Taylor was arrested by Rinehart at roughly 4:25 p.m. After her arrest, Taylor was transported to a local CHP station. Once there, Taylor was

15

advised of the implied consent rules of the California Vehicle Code which requires those arrested for driving under the influence to submit a sample of their blood or have his or her license suspended for a year. Officer Clinkscales then needed to speak to Officer Rinehart and get the facts of the case before attempting to secure a warrant. After speaking to the on-call deputy district attorney, Officer Clinkscales waited to hear back from the Marshall's service. Instead, at about 6:00 p.m. he heard back from the deputy district attorney, who stated that the magistrate judge was unavailable; that the judge did not pick up the phone.[4] Based on his experience, Officer Clinkscales knew the court was closed and not due to open until the next day. Clinkscales stated he only made one attempt to contact the judge because that was standard procedure. Given the number of vehicles involved in the accident and the need to convey so much information and wait for a response, it cannot be said that this 90-minute delay between Taylor's arrest and the officer's attempt to secure a warrant was unreasonable.

While Taylor might, with the benefit of hindsight, conjure myriad options for what the district attorney or officers could have further done in the 30 minutes between the callback and Taylor's blood draw, this is not the appropriate inquiry. The United States Supreme Court has explained that the inquiry is not on what could have been done but "whether the Fourth Amendment *requires* such steps; it is not our function to write a manual on administering routine, neutral procedures of the stationhouse. Our role is to

---

[4]    On cross-examination, Officer Clinkscales stated that "the conversation that I had with [Deputy District Attorney] Mosler was he explained to me there is not going to be a judge available. And I said, 'Okay. Well, we need to get the blood.' "

16

assure against violations of the Constitution."  (*Illinois v. Lafayette* (1983) 462 U.S. 640, 647.)  Given the totality of the circumstances, including the passage of time from the accident, the inevitable dissipation of the alcohol in Taylor's blood, and Officer Clinkscales's unsuccessful effort to obtain a warrant beforehand with the understanding that *McNeely* required such an effort, it appears the exigency of the circumstances rendered Taylor's warrantless blood draw objectively reasonable.

We need not, however, further analyze or resolve the question of whether Taylor's warrantless blood draw was reasonable and met *McNeely*'s standards because we agree with the People that the blood evidence is not subject to the exclusionary rule under the good faith exception.  (See, e.g., *People v.Youn* (2014) 229 Cal.App.4th 571; *People v. Rossetti* (2014) 230 Cal.App.4th 1070; *People v. Jones* (2014) 231 Cal.App.4th 1257; *People v. Harris* (2015) 234 Cal.App.4th 671.)  That is, there is no dispute in this case that Officer Clinkscales was aware of *McNeely*, *supra*, 133 S.Ct. 1552 and therefore took steps to obtain a telephonic warrant to permit a blood sample to be taken.  Having contacted the district attorney, who in turn attempted to call the on-call magistrate judge who was then unavailable, and knowing that Taylor's blood alcohol level was dissipating, he ultimately concluded *McNeely* would permit the blood draw without a warrant based on the exigency of the circumstances.  Faced with more than a three-hour passage of time since the accident, Officer Clinkscales ordered the administration of Taylor's blood draw. Clinkscales did not attempt to contact the judge again because he said that was "not standard procedure.  If you can't get a judge, you can't get a judge."

17

We acknowledge that *People v. Youn*, *supra*, 229 Cal.App.4th 571, *People v. Rossetti*, *supra*, 230 Cal.App.4th 1070, *People v. Jones*, *supra*, 231 Cal.App.4th 1257, and *People v. Harris*, *supra*, 234 Cal.App.4th 671 involve an officer's reliance on *Schmerber v. California* (1966) 384 U.S. 757, the law preceding *McNeely*,[5] but the cases in our view do not limit application of the good faith exception to such circumstances. In *Youn*, the defendant in 2011 was involved in a car collision and unresponsive to potent sedatives. (*Id*. at pp. 573-574.) Seeing his behavior, a responding officer suspected he was on a stimulant and placed him under arrest, ordering a blood draw from defendant without a warrant because obtaining a warrant was not standard operating procedure at that time. (*Id*. at p. 574.) Two years later, after *McNeely* was decided, the court held a hearing on the defendant's motion to suppress evidence of his blood draw and denied the motion, finding the officer acted reasonably and suppression would not have a deterrent effect on police misconduct because the officer did not engage in any misconduct. (*People v. Youn*, 229 Cal.App.4th at pp. 574-575.)

The Court of Appeal recognized that "[Youn's] case is governed by the rule in *McNeeley*." (*People v. Youn*, *supra*, 229 Cal.App.4th at p. 578.) However, it affirmed the order without deciding whether the warrantless blood test was reasonable, pointing

---

5     "Prior to *McNeely*, all binding judicial precedent in this state, both at the Supreme Court and intermediate appellate levels, consistently interpreted *Schmerber* to permit warrantless blood draws incident to a valid arrest and done in a medically approved manner. [Citation.] '[W]hen binding appellate precedent specifically *authorizes* a particular police practice, well-trained officers will and should use that tool to fulfill their crime-detection and public-safety responsibilities.' " (*People v. Jones*, *supra*, 231 Cal.App.4th at p. 1265.)

18

out that " 'searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule.' " (*Id*. at pp. 578-579.)  It held that in 2011, the officer acted in objectively reasonable reliance on binding California precedent construing *Schmerber*, *supra*, 384 U.S. 757.  Thus the exclusionary rule would not be served by barring the admission of the warrantless blood draw because the officer acted in objectively reasonable reliance on binding precedent and "there was no police culpability." (*Youn*, at p. 579.)

Here, Officer Clinkscales's understanding of *McNeely*—which acknowledges that exigency may arise due to delays in the warrant process or where a magistrate is unavailable—was not so entirely unreasonable as to negate his good faith.  It cannot be said that either he or Officer Rinehart acted in an objectively unreasonable manner; that either acted " 'deliberately, recklessly, or with gross negligence,' " or that this " 'case involv[ed] any "recurring or systematic negligence" ' " on their part.  (*People v. Harris*, *supra*, 234 Cal.App.4th at p. 703, quoting *Davis v. U.S.*, *supra*, 131 S.Ct. at p. 2428.)  As in *Youn* and *Harris*, the exclusionary rule should not apply here "[b]ecause suppression would do nothing to deter police misconduct in these circumstances," and because "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." (*Davis*, at pp. 2423-2424.)

To this point, Taylor argues in reply that since her blood was drawn three months after *McNeely* was decided that the good faith exception does not apply as it did in *Youn*, where the blood draw occurred before the decision.  But the out-of-state authority on which Taylor relies—*State v. Fierro* (S.D. 2014) 853 N.W.2d 235—is inapposite.  There,

19

the officer arrested and drew the defendant's blood four months after *McNeely* was decided, and despite the officer's new training on *McNeely*'s effect, he did not obtain her consent or a warrant. (*Id*. at pp. 237-238.) The court there held that when an officer is aware of new precedent, but conducts activity in accordance with prior, contrary precedent, his actions cannot be objectively reasonable and suppression of the evidence was proper. (*Id*. at p. 245.) The case does not compel reversal here, where Officer Clinkscales sought to act in accordance with *McNeely* by seeking a warrant after Taylor refused to consent to a blood draw. *McNeeley* is itself "binding appellate precedent" and as such when Officer Clinkscales conducted a search in "objectively reasonable reliance" on his knowledge of *McNeeley*, the search is not subject to the exclusionary rule. (See *Davis*, *supra*, 131 S.Ct. at pp. 2423-2424.)

## II. *Claim Regarding Court's Failure to Conduct a Marsden Hearing*

Taylor contends the trial court abused its discretion by failing to conduct a *Marsden* hearing when she expressed her desire to fire her counsel. She points out the court did not inquire about the reasons why she was dissatisfied with her lawyer, pose any questions in response to her request that counsel email her and "do [her] job," or follow up on counsel's suggestion that the court set a *Marsden* hearing on the day of Taylor's continued readiness hearing. Taylor argues the error is prejudicial because without a record regarding her concerns, the appellate court is unable to conclude beyond a reasonable doubt that the denial of the motion did not contribute to her conviction.

The People respond that Taylor's comments did not constitute a clear and unambiguous *Marsden* request for substitute counsel. They argue her comments in

20

reference to firing her court-appointed attorney were merely frustrated outbursts that Taylor subsequently contradicted by asking defense counsel to send her an email and to do her job. The People further contend that even if Taylor's statements constituted a *Marsden* request, reversal is not warranted because any failure to hold a *Marsden* hearing was harmless beyond a reasonable doubt in that Taylor never complained below that her counsel's performance was inadequate, and does not contend on appeal that her counsel provided ineffective assistance.

A. *Legal Principles*

Criminal defendants are entitled under the state and federal Constitutions to assistance of counsel if they cannot employ private counsel. (*Marsden*, *supra*, 2 Cal.3d at p. 123; U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Gideon v. Wainwright* (1963) 372 U.S. 335, 344-345.) That right may include the right to have counsel discharged or substituted if the defendant shows that the right to competent counsel " 'would be substantially impaired . . . in case the request is not granted . . . .' " (*Marsden*, *supra*, 2 Cal.3d at p. 123.) The court, however, is not required to conduct a *Marsden* hearing sua sponte. (*People v. Martinez* (2009) 47 Cal.4th 399, 421.) Its duty to hold such a hearing arises "only when there is 'at least some clear indication by defendant,' either personally or through his current counsel, that defendant 'wants a substitute attorney' " because her counsel's performance is so inadequate as to deny her the constitutional right to effective counsel. (*People v. Sanchez* (2011) 53 Cal.4th 80, 90; *People v. Lucky* (1988) 45 Cal.3d 259, 281, fn. 8.)

21

In *Marsden*, the defendant stated he did not believe he was " 'getting adequately represented or competently represented' " and expressed his belief the " 'court's transcript prior to this meeting here can reveal that fact.' " (*Marsden*, *supra*, 2 Cal.3d at p. 121.) When the defendant sought to proffer specific instances of misconduct, the trial court refused his request, telling the defendant the court did not want him to say anything that might prejudice him as to his case. (*Id.* at p. 122.) The *Marsden* court held it was error to deny defendant the opportunity to explain the basis for his claim because such a denial based "solely on the basis of [its] courtroom observations, despite a defendant's offer to relate specific instances of misconduct, abuses the exercise of [its] discretion to determine the competency of the attorney." (*Id.* at p. 124.)

Under *Marsden*, when a defendant seeks substitute counsel, in order to thoughtfully exercise its discretion whether to discharge present counsel, a trial court is required to listen to a defendant's complaints about his attorney. (See *People v Lewis* (1978) 20 Cal.3d 496, 497 [purpose of the *Marsden* requirement was to ensure defendant is "permitted to state the reasons why he believes a court-appointed counsel should be discharged"].) Thus, "*Marsden* motions are subject to the following well-established rules. ' " 'When a defendant seeks to discharge his appointed counsel and substitute another attorney, and asserts inadequate representation, the trial court must permit the defendant to explain the basis of his contention and to relate specific instances of the attorney's inadequate performance. [Citation.] A defendant is entitled to relief if the record clearly shows that the first appointed attorney is not providing adequate representation [citation] or that defendant and counsel have become embroiled in such an

22

irreconcilable conflict that ineffective representation is likely to result [citations].' [Citations.]" '  [Citation.]  Denials of *Marsden* motions are reviewed under an abuse of discretion standard.  [Citation.]  Denial 'is not an abuse of discretion unless the defendant has shown that a failure to replace the appointed attorney would "substantially impair" the defendant's right to assistance of counsel.' "  (*People v. Barnett* (1998) 17 Cal.4th 1044, 1085-1086.)

Following *Marsden*, this state's high court and other courts have held its requirements may be met without conducting a formal hearing.  When "the basis of a defendant's dissatisfaction with counsel is set forth in a letter of sufficient detail, . . . a full-blown hearing is not required."  (*People v. Wharton* (1991) 53 Cal.3d 522, 580 (*Wharton*); see also *People v. Freeman* (1994) 8 Cal.4th 450 (*Freeman*); *People v. Terrill* (1979) 98 Cal.App.3d 291, 299 (*Terrill*).)

In *People v. Wharton*, *supra*, 53 Cal.3d 522, the defendant challenged a prior murder conviction alleging the trial court improperly denied his motion to substitute counsel, thus violating his right to effective assistance of counsel.  (*Id*. at pp. 579-580.) In that prior case, he had sent a detailed letter to the trial judge complaining that his attorney had met only briefly with him, he had not been given ample opportunity to relate details on several matters to his attorney, and the attorney had too many other cases to give the case more attention.  (*Id.* at p. 580.)  The California Supreme Court acknowledged that the trial court had held a hearing and acknowledged receipt of that letter.  (*Ibid*.)  In holding there was no *Marsden* error, the court stated:  "When the basis of a defendant's dissatisfaction with counsel is set forth in a letter of sufficient detail,"

23

such that there are no more questions for the judge to ask, "a full-blown hearing is not required." (*Ibid*., citing *Terrill*, *supra*, 98 Cal.App.3d at pp. 298-299.) The court did not err in proceeding without a *Marsden* hearing because it was aware of grounds for the motion and satisfied itself that defense counsel had adequately performed. (*Wharton,* at pp. 580-581.)

In *Terrill*, the defendant filed a handwritten motion for substitute counsel to the judge. (*Terrill*, *supra*, 98 Cal.App.3d at pp. 296, 302.) He complained that his public defender had only met with him twice and encouraged him to accept a 15-year disposition for his murder charge because the jury would "fin[d] [him] guilty anyway." (*Id.* at p. 296.) Defendant wanted a new lawyer because he did not believe his attorney had his best intentions in mind. (*Ibid.*) On the date set for trial, the trial court acknowledged reading the letter and the overwhelming evidence against the defendant. (*Id*. at p. 297.) The trial court found it proper for counsel to attempt to explore a disposition because of the severity of the offense and the inculpatory evidence. (*Id.* at p. 297.) The appellate court agreed, noting that the defendant's letter did not state vague general dissatisfaction, and was of sufficient detail such that the trial court "was fully apprised of the specific allegations leveled against defense counsel." (*Id.* at p. 299.) It rejected the claim that the letter showed a breakdown in the attorney-client relationship, observing that had that been the case, defense counsel would have joined in the motion and not announced he readiness for trial. (*Id*. at p. 301.) Given the trial court's inquiry, these circumstances were substantially different from those in *Marsden*; the defendant had the opportunity in his letter and in court to present specific charges and "an adequate

24

inquiry into the reasons for defendant's motion" were made. (*Id.* at p. 302.) Denial of the motion was not an abuse of discretion. (*Ibid*.)

In *Freeman*, *supra*, 8 Cal.4th 450, the California Supreme Court once again concluded that the trial court was not required to hold a *Marsden* hearing when the defendant had itemized his complaints in a "self-contained document." (*Id*. at p. 481.) In *Freeman*, the defendant filed a formal written petition for new counsel on a form that permitted him to state facts that supported his request. (*Ibid.*) Concluding that the defendant already had the equivalent of a *Marsden* hearing, the *Freeman* court stated: "The form he used permitted him to state all reasons for the relief requested. . . . There was no reason for the trial court to suppose defendant withheld his reasons or supporting facts, or wished to state further examples of counsel's inadequate representation. He certainly did not 'offer to relate specific instances of misconduct.' " (*Ibid.*)

B. *Analysis*

Taylor interrupted proceedings twice during the December 2013 hearing expressing her desire to "fire" her counsel and stating, "You're fired, I'm not working well with you." These remarks, combined with Taylor's letter to the court in which she suggested she might make a *Marsden* request, compel us to disagree with the People's portrayal of Taylor's comments as merely frustrated outbursts. Such a characterization disregards Taylor's status as a lay person ignorant of the law or the terms of art used to present motions to the court. (See *Marsden*, *supra*, 2 Cal.3d at p. 124.) *Marsden* made clear that "semantics employed by a lay person in asserting a constitutional right should not be given undue weight in determining the protection to be accorded that right." (*Ibid*;

25

see *People v Lucky*, *supra*, 45 Cal.3d at p. 281 & fn. 8 [a trial court must hear defendant's reasons for dissatisfaction with his attorney "when the defendant in some manner moves to discharge his current counsel" and "we do not necessarily require a proper and formal legal motion"].) Thus, Taylor's remarks to the effect that she wanted to fire her court-appointed counsel should be viewed as a lay person's motion for substitute counsel.

After inartfully making her oral motion, however, Taylor appeared to acquiesce to counsel's continued representation. The People suggest that Taylor abandoned her request for substitute counsel when she thereafter contradicted herself and asked her counsel to "do [her] job." We agree it is arguable that abandonment may be inferred from Taylor's agreement after being informed that her counsel would be meeting with the district attorney. (See *People v. Vera* (2004) 122 Cal.App.4th 970, 981-982; *People v. Jones* (2012) 210 Cal.App.4th 355, 361-362.) There is no indication Taylor renewed her request for substitute counsel before the matter proceeded to trial or at any other point. Taylor's *Marsden* claim may be rejected on that basis alone.

We alternatively conclude that Taylor's letter and communications sufficiently informed the trial court about the reasons for her dissatisfaction so as to comply with *Marsden*'s requirements. As stated, "at any time during criminal proceedings, if a defendant requests substitute counsel, the trial court is obligated, pursuant to our holding in *Marsden*, to give the defendant an opportunity to state any grounds for dissatisfaction with the current appointed attorney." (*People v. Sanchez*, *supra*, 53 Cal.4th at p. 90.) A trial judge is unable to intelligently process such a request "unless he is cognizant of the grounds which prompted the request." (*Marsden*, *supra*, 2 Cal.3d at p. 123).

26

Through her letter and in-court remarks, Taylor laid out her contentions against defense counsel with specificity. She sought a *Marsden* hearing and to fire her court-appointed attorney because there had been too many continuances on her readiness hearing; the three-year negotiated sentence was too high; and she was not working well with defense counsel. In her letter, Taylor listed her preferred sentences, none of which required any further jail time. She was dissatisfied with the three-year sentence defense counsel had negotiated if Taylor was interested in entering a plea. As in *Terrill* where the court reasoned it was a "reasonable tactical decision" for counsel to attempt to explore a disposition based on the severity of the offense (*Terrill*, *supra*, 98 Cal.App.3d at p. 297), defense counsel in this case acted reasonably in attempted to negotiate a plea for Taylor. (See also *People v. Fairbank* (1997) 16 Cal.4th 1223, 1243 [guilty plea deemed reasonable tactical decision in light of the compelling evidence against the defendant].) Tactical disagreements between the defendant and his attorney do not establish an irreconcilable conflict so as to be sufficient cause for substitution of counsel. (*People v. Streeter* (2012) 54 Cal.4th 205, 230-231; *People v. Valdez* (2004) 32 Cal.4th 73, 95.) Taylor also indicated she was not working well with defense counsel. However, not relating well with counsel does not establish that there were irreconcilable differences nor does it follow that counsel's performance was ineffective. (*People v. Smith* (2003) 30 Cal.4th 581, 606 [lack of trust or inability to get along with counsel is not enough to compel substitution].) The record does not show or suggest defense counsel's representation was inadequate or that there was an irreconcilable conflict that cast doubt on defense counsel's ability to provide adequate representation.

27

In light of Taylor's ability to proffer the facts of her dissatisfaction with defense counsel, we conclude the trial court was fully apprised of the reasons for her motion. The court met its obligations to Taylor by giving her an "opportunity to explain" and "document" the basis for her contentions. (*People v. Marsden*, *supra*, 2 Cal.3d at p. 125.) The court did not reversibly err by not conducting a *Marsden* hearing because it was aware of the allegations made by Taylor and satisfied as to the representation provided by defense counsel.

## DISPOSITION

The judgment is affirmed.


O'ROURKE, J.

WE CONCUR:


McINTYRE, Acting P. J.


IRION, J.